*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0347p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

MICHAEL POWERS,

> *Plaintiff - Appellee,*

*v.*

HAMILTON COUNTY PUBLIC DEFENDER
COMMISSION, et al.,

> *Defendants - Appellants.*

No. 06-3460

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 02-00605—S. Arthur Spiegel, District Judge.

Argued: January 30, 2007

Decided and Filed: August 29, 2007

Before: NORRIS, COLE, and CLAY, Circuit Judges.

_____

## COUNSEL

**ARGUED:** David Todd Stevenson, HAMILTON COUNTY PROSECUTING OFFICE, Cincinnati, Ohio, for Appellants. Robert B. Newman, NEWMAN & MEEKS CO., Cincinnati, Ohio, for Appellee. **ON BRIEF:** David Todd Stevenson, Pamela J. Sears, HAMILTON COUNTY PROSECUTING OFFICE, Cincinnati, Ohio, for Appellants. Robert B. Newman, NEWMAN & MEEKS CO., Cincinnati, Ohio, Stephen R. Felson, Cincinnati, Ohio, for Appellee.

COLE, J., delivered the opinion of the court, in which CLAY, J., joined. NORRIS, J. (p. 23), delivered a separate dissenting opinion.

_____

## OPINION

_____

R. GUY COLE, JR., Circuit Judge. Defendants-Appellants Hamilton County Public Defender Office (the "Public Defender Office") and Hamilton County Public Defender Commission (the "Public Defender Commission") (collectively, the "Public Defender") appeal the judgment of the district court granting class certification and summary judgment to Plaintiff-Appellee Michael Powers. The Hamilton County municipal court ordered Powers to pay a fine in connection with a reckless-driving charge. Powers was subsequently incarcerated for non-payment of that fine. He

then filed this § 1983 class action, alleging that his constitutional rights were violated by the Public Defender's policy or custom of failing to seek indigency hearings on behalf of criminal defendants facing jail time for unpaid fines.

For the reasons set forth below, we **AFFIRM** the district court's ruling that Powers's § 1983 claims are cognizable, and **AFFIRM** the grant of class certification. We **REVERSE** the district court's grant of summary judgment to Powers and **REMAND** for further proceedings.

## I. BACKGROUND

On January 23, 2002, Powers pleaded no contest in Hamilton County, Ohio municipal court to a charge of reckless operation of a motor vehicle, a fourth-degree misdemeanor. Powers was convicted on the same day and sentenced to thirty days of incarceration. The court suspended twenty-seven of those days and ordered Powers to serve the remaining three days in a driver-intervention program. The court further ordered Powers to pay a $250 fine and court costs.

Two months later, on March 23, 2002, Powers was arrested for violating his probation by, among other things, failing to pay the court-ordered fine. He again pleaded no contest and was found guilty. The court terminated Powers's probation and reinstated his original sentence of thirty days of incarceration, minus credit for one day served. Powers alleges that he served at least one day in the Hamilton County jail for his failure to pay the fine. At oral argument, the Public Defender conceded that Powers spent some portion of his time behind bars exclusively in connection with the unpaid fine.

Attorneys with the Public Defender Office represented Powers at both his January plea and sentencing for the reckless-driving charge, and the March hearing at which his probation was revoked. Powers alleges that he was deprived of an indigency hearing because the Public Defender has a policy or custom of failing to request such hearings when its clients face jail time for non-payment of court-ordered fines.

On August 21, 2002, Powers filed a class-action complaint seeking damages under 42 U.S.C. § 1983 on the theory that his incarceration, in the absence of any inquiry into his ability to pay the court-imposed fine, violated his Fifth, Sixth, and Fourteenth Amendment rights. Powers also asserted a legal-malpractice claim. In his original complaint, Powers named as defendants the Public Defender Office; the Public Defender Commission; and Simon L. Leis, Jr., the Sheriff of Hamilton County (the "Sheriff"). On June 4, 2003, Powers amended his complaint to add as defendants Hamilton County (the "County") and Hamilton County's Board of Commissioners (the "Board of Commissioners").

Powers moved for class certification on August 5, 2003. Defendants moved for summary judgment on November 5, 2003. The district court held a hearing on both motions and issued a joint order on August 23, 2005. The district court granted the Defendants partial summary judgment by dismissing the Sheriff, the County, and the Board of Commissioners and further dismissing Powers's legal-malpractice claim. The district court declined to grant summary judgment as to the Public Defender Office and the Public Defender Commission. The court rejected these Defendants' argument that Powers's § 1983 claims are not cognizable. The court further concluded that the evidence established that the Public Defender "had a well-settled custom or policy of not asking for an indigency hearing before a probationer is incarcerated for failure to pay a fine," and that the Public Defender was a state actor for purposes of § 1983. (District Court's Order [On Plaintiff's Motion For Class Certification And Defendants' Motion For Summary Judgment] at 13-14.)

After disposing of the Public Defender's motion for summary judgment, the district court went on to grant Powers's class-certification motion. The court concluded that Powers had satisfied all the prerequisites of Federal Rule of Civil Procedure 23(a) and that certification was proper under

Rule 23(b)(3) because Powers's case presents questions of law or fact common to the class that predominate over questions affecting only individual class members.  Although the court periodically tinkered with the class definition, it ultimately certified a class consisting of

> [a]ll persons who, without an indigency hearing, were committed to the custody of a Hamilton County correctional facility by a Hamilton County municipal or common pleas court from August 21, 2000, to the present in satisfaction of a fine and/or court costs, including persons who violated probation following a "stay to pay" sentence.

(Final Judgment Order at 1.)

Powers subsequently brought his own motion for partial summary judgment on liability, arguing that "the [c]ourt's rejection of Defendants' [summary-judgment] motion clearly establishes liability in his favor and in favor of the class."  (Order [On Powers's Motion For Partial Summary Judgment] at 2.)  The district court granted Powers's motion.  Even though the Public Defender submitted additional evidence to negate the existence of the alleged policy or custom of failing to request indigency hearings, the district court concluded that the Public Defender's showing was insufficient to raise a genuine issue of material fact.

Finally, the district court approved the content and dissemination of the class notice and claim form, to be sent to a stipulated list of class members via United States mail and published in the *Cincinnati Enquirer*.   The court further approved a damage award equal to $100 per day for each day of a class member's incarceration.  The court then stayed its judgment pending the resolution of the Public Defender's appeal.

## II.  DISCUSSION

The Public Defender asserts that the district court erred in several respects.  First, the Public Defender argues that the district court was obligated to dismiss Powers's § 1983 suit as barred by the Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477 (1994).  Second, the Public Defender contends that a proper balancing of the relationship between state and federal courts as embodied in the *Younger* abstention doctrine and the *Rooker-Feldman* doctrine precludes Powers's § 1983 claims.  Third, the Public Defender argues that the district court erred in granting summary judgment to Powers because (1) it did not cause the deprivation of Powers's rights, (2) it is not a state actor for purposes of § 1983, and (3) the evidence showed at least a disputed question of fact as to the existence of its alleged policy or custom of failing to seek indigency hearings for clients threatened with jail time for the non-payment of fines.  Finally, the Public Defender contends that the district court erred in certifying a class.

We begin by considering whether Powers may even maintain his § 1983 action and then move on to consider whether he is entitled to summary judgment and class certification.

## A.        Standard of Review

We review the district court's grant of summary judgment de novo.  *Watkins v. Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001).  Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case."  *Beecham v. Henderson County*, 422 F.3d 372, 374 (6th Cir. 2005).

**B.      Powers's § 1983 Claims Are Cognizable**

The Public Defender argues that the district court erred in holding that Powers's § 1983 claims are cognizable.  Citing *Heck v. Humphrey*, the Public Defender contends that a § 1983 damages action in connection with an allegedly unlawful conviction or sentence cannot be maintained unless the conviction or sentence has been invalidated.  512 U.S. 477 (1994).  Because the municipal court never set aside Powers's conviction and sentence, the Public Defender argues that Powers cannot proceed on his § 1983 suit.

Powers responds that *Heck* poses no obstacle to his case for two reasons.  First, Powers argues that *Heck* is inapplicable to § 1983 claimants who, like himself, were precluded from challenging the legality of their convictions and sentences through a federal habeas action.  Second, Powers argues that his case fits within an exception to *Heck* because he challenges the flawed procedures used to incarcerate him—that is, the lack of an inquiry into his ability to pay the court-ordered fine—and not his underlying conviction for reckless driving or his jail sentence.  Powers contends that his procedural attack is analytically distinct from an attack on the municipal court's judgment.

1.  Heck's *Favorable-Termination Requirement*

Section 1983 establishes tort liability for the deprivation of federal rights by persons acting under color of state law.  42 U.S.C. § 1983 (2007).  In *Heck*, the Supreme Court addressed whether an Indiana prison inmate could maintain a § 1983 suit in which he alleged that the defendants (the prosecuting attorney and an Indiana State Police investigator) violated his constitutional rights by conducting an illegal investigation leading to his arrest, destroying exculpatory evidence, and using an illegal voice-identification procedure at his trial.  512 U.S. at 478-79.

The Supreme Court analogized Heck's § 1983 claim to a tort claim for malicious prosecution.  *Id.* at 484.  An element of a malicious-prosecution claim is a showing that the plaintiff prevailed in the criminal proceeding that gave rise to the malicious-prosecution lawsuit.  The Court noted that this "favorable-termination requirement" protects against the risk of inconsistent judgments that collateral attacks on criminal convictions could otherwise engender.  *Id.* at 484-85.  Accordingly, the Supreme Court held that a § 1983 damages action in connection with an unlawful conviction or sentence will not lie unless the claimant, like a malicious-prosecution plaintiff, can show that the underlying conviction or sentence has been invalidated:

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.

*Id.* at 486-87.  Moreover, the Supreme Court instructed that even if the plaintiff challenges something other than his conviction or sentence, where a ruling in his favor would "necessarily imply the invalidity of his conviction or sentence," the favorable-termination requirement applies:

> [W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.* at 487.

Justice Souter, joined by three of his colleagues, wrote a separate concurrence in *Heck*, in which he expressed the view that the favorable-termination requirement does not preclude § 1983 lawsuits by persons who could not have their convictions or sentences impugned through habeas review. Because petitioners may obtain habeas relief only if they are "in custody," Justice Souter noted that persons "who were merely fined, for example, or who have completed short terms of imprisonment, probation, or parole, or who discover (through no fault of their own) a constitutional violation after full expiration of their sentences" are prohibited from bringing habeas actions to challenge their convictions or sentences. *Id.* at 500. Justice Souter argued that applying *Heck's* favorable-termination requirement to § 1983 claimants in these circumstances would have the effect of altogether denying them a federal forum for the alleged deprivation of their federal rights. He reasoned that such an outcome was impermissible for two reasons. First, applying the favorable-termination requirement to claimants prohibited from seeking habeas relief is inconsistent with broad construction of § 1983 and the statute's purpose of "'interpos[ing] the federal courts between the States and the people, as guardians of the people's federal rights.'" *Id.* at 501 (quoting *Mitchum v. Foster*, 407 U.S. 225, 242 (1972)); *accord Dennis v. Higgins*, 498 U.S. 439, 443 (1991) (stating that § 1983 "provides a remedy, to be broadly construed, against all forms of official violation of federally protected rights"). Second, Justice Souter argued that absent "unambiguous Congressional direction," the Supreme Court "lacks the authority" to deny a § 1983 cause of action to those who could not pursue habeas relief. *Id.*

In *Spencer v. Kemna*, Justice Souter, again in concurrence, reiterated his conclusion that *Heck's* favorable-termination requirement is inapplicable to those persons prevented from satisfying it "as a matter of law." 523 U.S. 1, 21 (1998). *Spencer* was a habeas, not a § 1983, case, in which the Supreme Court held that Spencer's habeas petition was moot because he had completed his term of incarceration. *Id.* at 17-18. Spencer argued that the Court could not dismiss his petition on mootness grounds because, absent a merits adjudication, he could not satisfy *Heck's* favorable-termination requirement, and therefore would be barred from bringing a § 1983 challenge to the alleged deprivation of his constitutional rights. *Id.* at 17.

The Court rejected Spencer's argument. Nonetheless, a majority of the Court agreed with Justice Souter's view that the dismissal of Spencer's habeas petition on mootness grounds did not eliminate Spencer's right to seek § 1983 relief. Justices O'Connor, Ginsburg, and Breyer joined Souter's concurrence and Justice Stevens, in dissent, stated that "it is perfectly clear, as Justice Souter explains, that he [Spencer] may bring an action under § 1983." *Id.* at 18, 25, n.8; *see also Wallace v. Kato*, 127 S. Ct. 1091, 1101 (2007) (Stevens, J. concurring) (stating that "because a habeas remedy was never available to [petitioner] in the first place," *Heck* did not postpone the accrual of petitioner's § 1983 claim). Justice Souter went so far as to concede that if the dismissal of Spencer's petition actually foreclosed a § 1983 damages action, Spencer would be correct in claiming that dismissal would be improper. *Spencer*, 523 U.S. at 19. But, Spencer's argument failed because he could not challenge his conviction through a habeas proceeding, and therefore he "[was] free to bring a § 1983 action." *Id.*

2.        Heck *Is Inapplicable Because Powers Was Foreclosed from Challenging his Incarceration in a Habeas Action*

Drawing on Justice Souter's *Heck* and *Spencer* pronouncements, Powers argues that the favorable-termination requirement is inapplicable to his claims because he has been released from prison. As an initial matter, Powers misstates the nature of the *Heck* limitation that Justice Souter has theorized. What is dispositive in Powers's situation is not that he is no longer incarcerated, but that his term of incarceration—one day—was too short to enable him to seek habeas relief. It seems unlikely that Justice Souter intended to carve out a broad *Heck* exception for all former prisoners.

The better reading of his analysis is that a § 1983 plaintiff is entitled to a *Heck* exception if the plaintiff was precluded "as a matter of law" from seeking habeas redress, but not entitled to such an exception if the plaintiff could have sought and obtained habeas review while still in prison but failed to do so. *See, e.g., Guerrero v. Gates*, 442 F.3d 697, 705 (9th Cir. 2006) (holding that the plaintiff could not "now use his failure timely to pursue habeas remedies as a shield against the implications of *Heck*") (internal quotation marks omitted).

To date, neither we, nor the Supreme Court, have conclusively resolved whether *Spencer* should be construed as limiting the reach of *Heck* such that a § 1983 claimant in Powers's shoes is excepted from the favorable-termination requirement. In *Shamaeizadeh v. Cunigan*, we stated that *Spencer* "clearly excludes from *Heck's* favorable termination requirement former prisoners no longer in custody." 182 F.3d 391, 396 n.3 (6th Cir. 1999). In contrast, in *Huey v. Stine*, we acknowledged the uncertainty generated by *Spencer*, but nonetheless held that *Heck* was still controlling where the plaintiff (an inmate) could not bring a habeas challenge to his thirty-day disciplinary detention because the detention had expired. 230 F.3d 226, 230 (6th Cir. 2000). In *Muhammad v. Close*, however, the Supreme Court reversed *Huey* and stated that "[t]his case is no occasion to settle the issue" of whether *Heck's* favorable-termination requirement applies to § 1983 plaintiffs who are habeas ineligible. 540 U.S. 749 (2004).

Although we have not yet definitively weighed in on the interplay between *Heck* and *Spencer*, our sister circuits are divided on the question. Four circuits, including the First, Third, Fifth, and Eighth Circuits, have rejected Justice Souter's analysis and instead have held that § 1983 claimants must comply with *Heck's* favorable-termination requirement even if habeas relief was unavailable to them. These courts have reasoned that to recognize an exception to *Heck* along the lines sketched by Justice Souter would amount to an impermissible deviation from Supreme Court precedent.

In *Figueroa v. Rivera*, for example, the appellants brought a § 1983 action on behalf of a convicted murderer, Rios, who had died in prison. 147 F.3d 77, 79 (1st Cir. 1998). Rios had filed a habeas petition in federal district court but the district court dismissed it as moot following his death. *Id.* at 79-80. The First Circuit acknowledged that Rios "was attempting to impugn his conviction when death intervened," but it nonetheless determined that *Heck* barred the appellants' § 1983 suit because Rios's conviction had not been set aside in a prior proceeding. *Id.* at 80-81. Even though *Spencer* "may cast doubt upon the universality of *Heck's* 'favorable termination' requirement," the First Circuit reasoned that it was bound to apply Supreme Court precedent, "even if that precedent appears weakened by pronouncements in its subsequent decisions," because only the Supreme Court has the authority to overrule its own decisions. *Id.* at 81 n.3 (citing *Agostini v. Felton*, 521 U.S. 203 (1997)); *see also Entzi v. Redmann*, 485 F.3d 998, 1003 (8th Cir. 2007) (declining to read *Spencer* to allow a former prisoner to maintain his § 1983 action on the grounds that *Heck* did not differentiate between prisoners and habeas-ineligible former prisoners for purposes of applying the favorable-termination rule and no Supreme Court decision had "explicitly overrule[d]" *Heck*); *Gilles v. Davis*, 427 F.3d 197, 209-10 (3d Cir. 2005) (declining to recognize a *Heck* exception for a habeas-ineligible plaintiff on the grounds that the court had no authority to question *Heck's* "continued validity"); *Randell v. Johnson*, 227 F.3d 300, 301-02 (5th Cir. 2000) (declining to recognize a *Heck* exception for a § 1983 plaintiff who was no longer imprisoned because it is not the prerogative of a lower federal court to "announce for the Supreme Court that it has overruled one of its decisions").

We disagree with the reasoning of our sister circuits who have decreed themselves bound by *Heck* to the exclusion of Justice Souter's comments in his *Heck* and *Spencer* concurrences. These courts have mistaken the ordinary rule refinement that appellate courts necessarily engage in for an improper departure from binding Supreme Court precedent. The *Heck* Court was not confronted with a factual scenario like Powers's, in which the § 1983 claimant has no recourse in habeas and

thus cannot have his conviction or sentence set aside by a federal court. The plaintiff in *Heck* was still incarcerated and so could have sought habeas relief. Thus, adopting Justice Souter's rationale does not amount to a failure to follow *Heck* where *Heck* offered no binding guidance on the application of the favorable-termination requirement to the circumstances here. Moreover, the only way to side with those circuits that have enforced the favorable-termination requirement against habeas-ineligible plaintiffs is to altogether ignore *Spencer*, in which five justices (four in concurrence and one in dissent) agreed that *Heck* did not extend that far. Casting *Spencer* aside is something we decline to do.

We are persuaded by the logic of those circuits that have held that *Heck's* favorable-termination requirement cannot be imposed against § 1983 plaintiffs who lack a habeas option for the vindication of their federal rights. Most analogous to Powers's case is *Leather v. Ten Eyck*, in which the Second Circuit concluded that the plaintiff's § 1983 suit could proceed despite non-compliance with the favorable-termination requirement because the plaintiff had been assessed only a monetary fine in his criminal proceeding and thus was ineligible for habeas relief. 180 F.3d 420, 424 (2d Cir. 1999). The Ninth and Eleventh Circuits also have dispensed with the favorable-termination requirement where habeas is unavailable. *See Nonnette v. Small*, 316 F.3d 872, 875-77 (9th Cir. 2002) (declining to apply the favorable-termination requirement where the plaintiff could not pursue habeas relief because he had been released from jail); *Harden v. Pataki*, 320 F.3d 1289, 1298-99 (11th Cir. 2003) (declining to apply the favorable-termination requirement where the plaintiff could not pursue habeas relief to challenge extradition procedures because the plaintiff had already been extradited).

These Circuits have the better-reasoned view. Powers was fined for his reckless-driving misdemeanor and then imprisoned for at least one, but not more than thirty, days for his failure to pay the fine. Under these circumstances, there is no way that Powers could have obtained habeas review of his incarceration. This is precisely the kind of situation that Justice Souter had in mind when he argued in *Heck* and *Spencer* that the favorable-termination requirement could not be deployed to foreclose federal review of asserted deprivations of federal rights by habeas-ineligible plaintiffs. Accordingly, we join the Second, Ninth, and Eleventh Circuits in holding that the favorable-termination requirement poses no impediment to Powers's § 1983 claims.

3.          Heck *Is Inapplicable Because Powers Challenges the Procedures that Led to his Incarceration, and not his Underlying Conviction or the Duration of his Sentence*

Besides being exempt from *Heck's* favorable-termination requirement because he could not have obtained habeas relief, we hold that Powers is exempt for a second reason. We agree with the district court's conclusion that Powers need not comply with the favorable-termination requirement because he alleges that his constitutional rights were violated as a result of improper procedures, not that his underlying conviction or jail sentence was improper. In two cases following *Heck*, the Supreme Court distinguished between § 1983 challenges to judgments and § 1983 challenges to the procedures that led to those judgments.

In *Edwards v. Balisok*, Edwards was a state prison inmate who filed a § 1983 action on the grounds that the procedures used in a prison disciplinary hearing deprived him of his due-process rights because the hearing officer was improperly biased against him. 520 U.S. 641 (1997). The Court described Edwards's claim as "posit[ing] that the procedures were wrong, but not necessarily that the result was." *Id.* at 645. Moreover, the Court stated that "[t]he distinction between these two sorts of claims is clearly established in our case law . . . ." *Id.*

Although the Court approved of an analytical framework that would remove procedure-based challenges from *Heck's* ambit, it nonetheless concluded that Edwards's claim was not cognizable. The Court held that if Edwards prevailed in his § 1983 suit by proving that the hearing officer was

indeed biased against him, such an outcome would implicitly negate the judgment in the disciplinary proceeding, even if there otherwise was sufficient evidence to support that judgment. *Id.* at 647. This was true because "[a] criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him." *Id.* Thus, *Balisok* cautions courts to scrutinize "the nature of the challenge to the proceedings" because even challenges to procedures "could be such as necessarily to imply the invalidity of the judgment." *Id.* at 645.

In *Wilkinson v. Dotson*, the Supreme Court affirmed the en banc judgment of this Court, giving the green light to two § 1983 cases challenging parole-hearing procedures. 544 U.S. 74 (2005). The plaintiffs in *Wilkinson* were two Ohio inmates serving lengthy jail sentences. *Id.* at 76. Both were denied parole on the basis of 1998 parole guidelines but argued that the guidelines in effect in the year in which they were convicted should have been used instead. *Id.* at 76-77. One plaintiff further argued that there were too few board members present at his parole hearing and that he was denied an opportunity to speak. *Id.* at 77. The plaintiffs alleged that these procedures violated the Constitution's Ex Post Facto and Due Process Clauses. *Id.* at 76-77.

The Supreme Court held that the suits could proceed in part because if the prisoners were successful, they would be entitled only to new parole hearings at which constitutionally proper procedures would be used (the prisoners sought declaratory and injunctive relief, not damages). *Id.* at 82. Success did not "necessarily imply the invalidity of their convictions or sentences," or for that matter, of the parole board's judgment declining to release them. *Id.*

*Balisok* and *Wilkinson* establish that Powers need not comply with *Heck's* favorable-termination requirement. To prevail in his § 1983 suit, Powers must show that he was not afforded an indigency hearing to which he had a constitutional right before being committed to jail. If he succeeds, the resulting judgment in his favor would in no way impugn his conviction for reckless driving. A conclusion that the procedures, or rather the lack of procedures, that culminated in Powers's incarceration violated his constitutional rights has nothing to do with the propriety of his underlying conviction. Indeed, the only aspect of Powers's criminal proceedings that could possibly be regarded as vulnerable to a collateral judgment of invalidity is the municipal court's order sending Powers to jail for non-payment of the fine. Even here, however, if Powers succeeds in his § 1983 suit, that means only that the failure to grant Powers an indigency hearing was wrongful, not that the order committing him to jail was wrongful. *See McKithen v. Brown*, 481 F.3d 89, 102-03 (2d Cir. 2007) (holding that the favorable-termination requirement did not bar a § 1983 action seeking DNA testing of evidence because if the plaintiff prevailed on his § 1983 claims, he would be entitled only to production of the evidence for testing, and "[s]uch testing, of course, '*necessarily* implies nothing at all about the plaintiff's conviction'") (quoting *Harvey v. Horan*, 285 F.3d 298, 308 (4th Cir. 2002)); *see also Ballard v. Burton*, 444 F.3d 391 (5th Cir. 2006) (holding that the favorable-termination requirement did not bar a § 1983 claim for excessive force because a conclusion that the defendant's use of force was objectively unreasonable would not necessarily call into question the plaintiff's criminal conviction for assault). Powers's incarceration is not "necessarily invalid" because Powers may have willfully refused to pay a fine he was capable of paying, rather than having been actually impecunious. *Nelson v. Campbell*, 541 U.S. 637, 647 (2004) ("[W]e were careful in *Heck* to stress the importance of the term 'necessarily.'"). This we cannot guess at precisely because Powers did not get an indigency hearing.

Decisions from other Circuits holding that *Heck* does not bar § 1983 challenges to extradition procedures support Powers's position. In *Harden*, for example, the plaintiff argued that he was extradited from Georgia to New York in violation of his due-process rights because he was denied a pre-extradition habeas hearing. *Harden*, 320 F.3d at 1292. In addition to concluding that the favorable-termination requirement did not apply because Harden was prevented from seeking habeas relief (the extradition had already occurred), the Eleventh Circuit held that "*Heck* does not bar purely procedural claims brought under § 1983." *Id.* at 1295. Harden's claims were procedural in nature

because if he succeeded in proving that the extradition procedures were unconstitutional, that did not mean his conviction and sentence for the crime for which he was extradited were invalid: "[E]xtradition *procedures*, even if they violate federal rights, have no bearing, direct or implied, on the underlying guilt or innocence of the person extradited." *Id.* at 1297; *see also Weilburg v. Shapiro*, 488 F.3d 1202 (9th Cir. 2007) (holding that because the plaintiff's allegations challenging the procedures used to extradite him from Arizona to Illinois would not affect his underlying conviction, *Heck* did not apply). The same rationale applies to Powers's situation. The Public Defender's alleged practice of not requesting indigency hearings has no bearing on Powers's guilt or innocence in failing to pay his court-ordered fine.

Accordingly, we hold that because Powers challenges the procedures that led to his incarceration and not the incarceration itself, Powers need not comply with the favorable-termination requirement.

## C.   Powers's § 1983 Action is not Barred by the *Younger* Abstention Doctrine or the *Rooker-Feldman* Doctrine

The Public Defender argues that considerations of comity require the dismissal of Powers's § 1983 claims. Invoking the *Younger* abstention doctrine and the *Rooker-Feldman* doctrine, the Public Defender says that allowing Powers's case to proceed will upset the proper relationship between the federal and state courts by permitting undue federal intrusiveness into the final judgments of a state court. The Public Defender is wrong.

The *Younger* abstention doctrine prevents federal courts from "stay[ing] or enjoin[ing] pending state court proceedings except under special circumstances." *Younger v. Harris*, 401 U.S. 37, 41 (1971). *Younger* only comes into play when three requirements are satisfied, including that there is an "on-going state judicial proceeding[]" running parallel to the federal action. *Squire v. Coughlan*, 469 F.3d 551, 555 (6th Cir. 2006). Here, Powers's proceedings in the state court have long since concluded and he has no competing action pending there. The *Younger* abstention doctrine therefore is inapplicable because there are no proceedings in the state courts for the federal courts to defer to.

The *Rooker-Feldman* doctrine bars parties that have lost in state court from filing suit in federal district courts for the purpose of obtaining review of the adverse state-court judgments. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Johnson v. DeGrandy*, 512 U.S. 997, 1005-06 (1994) (*Rooker-Feldman* prevents an unsuccessful state-court party "from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights").

The *Rooker-Feldman* doctrine has no bearing on Powers's claims because he does not allege that he was deprived of his constitutional rights by the state-court judgment, but rather by the Public Defender's conduct in failing to ask for an indigency hearing as a prerequisite to his incarceration. Assertions of injury that do not implicate state-court judgments are beyond the purview of the *Rooker-Feldman* doctrine. *See McCormick v. Braverman*, 451 F.3d 382, 392-93 (6th Cir. 2006) (holding *Rooker-Feldman* inapplicable because the plaintiff did not attack the state-court judgments but "assert[ed] independent claims that those state court judgments were [improperly] procured by" the defendants); *Todd v. Weltman, Weinberg, & Reis Co., L.P.A.*, 434 F.3d 432, 436-37 (6th Cir. 2006) (holding *Rooker-Feldman* not triggered because the plaintiff did not allege that he was injured by the state-court judgment, but instead filed an independent federal claim that he was injured by the defendant's filing of a false affidavit in the state-court proceeding).

For these reasons, we reject the Public Defender's *Younger* and *Rooker-Feldman* arguments.

**D.        The District Court Erred in Granting Summary Judgment for Powers**

In this section, we consider whether Powers is entitled to summary judgment in light of the requirements for establishing a § 1983 municipal-liability claim. We agree with Powers (1) that he has alleged a violation of a right protected by the Constitution, (2) that the Public Defender caused the alleged violation, and (3) that the Public Defender acted under color of state law in doing so. However, we reverse and remand the district's court grant of summary judgment because we conclude that, even assuming Powers has carried his evidentiary burden with respect to showing that the Public Defender has a policy or custom of failing to request indigency hearings, the Public Defender has raised a genuine question of material fact about the existence of the purported policy or custom, making summary judgment for Powers inappropriate.

1.        *The Requirements of a § 1983 Municipal-Liability Claim*

Section 1983 imposes liability against

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .

42 U.S.C. § 1983.

"[We] engage[] in a two-pronged inquiry when considering a municipal-liability claim." *Cash v. Hamilton County Dep't of Adult Prob.*, 388 F.3d 539, 542 (6th Cir. 2004). We first ask whether the plaintiff has asserted the deprivation of a right guaranteed by the Constitution or federal law. *Id.*; *Alkire v. Irving*, 330 F.3d 802, 813 (6th Cir. 2003). Second, we analyze whether the alleged deprivation was caused by the defendants acting under color of state law. *Cash*, 388 F.3d at 542; *Alkire*, 330 F.3d at 813.

A municipality cannot be liable for the constitutional torts of its employees; that is, it cannot be liable on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, liability will attach only where the plaintiff establishes that the municipality engaged in a "policy or custom" that was the "moving force" behind the deprivation of the plaintiff's rights. *Id.* at 694; *see also Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) ("Under *Monell*, the [defendants] cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom . . . leads to, causes, or results in the deprivation of a constitutionally protected right.").

The *Monell* Court described a municipal policy as including "a policy statement, ordinance, regulation, or decision officially adopted and promulgated . . . ." 436 U.S. at 690. An actionable "custom," in contrast, "has not received formal approval through . . . official decisionmaking channels." *Id.* at 690-91. A § 1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew about and acquiesced in the practice at issue. *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004).

Where a municipal-liability claim is premised on an "inaction theory," the plaintiff must prove (1) the existence of a clear and persistent pattern of violating federal rights (in this case, failing to request indigency hearings); (2) notice or constructive notice on the part of defendants; (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that the defendants' custom was the "moving force," or direct causal link for the constitutional deprivation.

*Doe*, 103 F.3d at 508; *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (applying *Doe* factors where the plaintiff alleged that the Chattanooga police department had a custom of tolerating the use of excessive force against detained suspects); *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005) (applying *Doe* factors where the plaintiff alleged that the city had a custom of failing to provide medical treatment to pre-arraignment detainees).

### 2.          *Powers Has Asserted the Deprivation of a Federal Right*

Powers alleges that the Public Defender's failure to request an inquiry into his ability to pay the court-ordered fine before he was jailed violated his Fifth, Sixth, and Fourteenth Amendment rights. Under the first prong of a § 1983 municipal-liability claim, we must evaluate whether these rights are federally protected such that, if proven, § 1983 will provide relief for their infringement. *See Doe*, 103 F.3d at 506 (stating that the Court's task was to "examin[e] the nature of the right claimed to have been infringed upon"—the right to be free from sexual abuse at the hands of a state actor—to determine whether it was embodied by the Fourteenth Amendment); *Cash*, 388 F.3d at 542 (commenting that "[t]here can be little doubt" that the plaintiff homeless persons had a constitutionally protected right in their personal belongings, which were taken and discarded pursuant to a municipal program).

The Public Defender does not dispute that Powers has satisfied the first prong of establishing § 1983 liability, nor can it:  In *Bearden v. Georgia*, the Supreme Court held that a state may not "impose a fine as a sentence and then automatically convert it into a jail term solely because the defendant is indigent and cannot forthwith pay the fine in full." 461 U.S. 660, 667 (1983).  The *Bearden* Court went on to hold that "fundamental fairness" requires a court to inquire into whether a criminal defendant is able to pay a fine. *Id.* at 673; *see also Alkire*, 330 F.3d at 816-17 (citing *Bearden* and holding that a criminal defendant's right to a judicial inquiry into his ability to pay a fine is well established by the Fourteenth Amendment).  Ohio has codified this requirement at Ohio Revised Code ("O.R.C.") § 2947.14, which provides that a hearing as to the offender's ability to pay the fine shall be conducted at the time of sentencing and that a court's conclusion that the offender is able to pay "shall be supported by findings of fact set forth in a judgment entry that indicate the offender's income, assets, and debts . . . ." *See also State v. Meyer*, 706 N.E.2d 378 (Ohio Ct. App. 1997) (holding that the duty to conduct a hearing is not triggered until the court seeks to enforce the imposition of a fine by ordering the defendant imprisoned).

Because there is no dispute that Powers has asserted the deprivation of a federal right, the next and more complex question is whether the Public Defender caused Powers's injury.

### 3.          *The Public Defender Was the "Moving Force" Behind the Violation of Powers's Constitutional Rights*

As described above, a § 1983 plaintiff must show that the defendant was the "moving force" behind the alleged deprivation of his federal rights. *Monell*, 436 U.S. at 694.  At bottom, this is a causation inquiry, requiring the plaintiff to show that it was the defendant's custom or policy that led to the complained of injury. *Garner*, 8 F.3d 358, 363-64 (6th Cir. 1993).

Traditional tort concepts of causation inform the causation inquiry on a § 1983 claim. *McKinley v. City of Mansfield*, 404 F.3d 418, 438 (6th Cir. 2005).  Thus, we must consider whether the Public Defender's failure to request an indigency hearing was both the cause in fact and the proximate cause of the denial of Powers's right to an indigency hearing prior to his incarceration for the unpaid fine.

(a)      *Cause in Fact*

First, we have no trouble concluding that the Public Defender's failure to act was the cause in fact of Powers's injury. Cause in fact is typically assessed using the "but for" test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than it did. David W. Robertson, *The Common Sense of Cause in Fact*, 75 Tex. L. Rev. 1765, 1768-69 (1997). "Conduct is the cause in fact of a particular result if the result would not have occurred but for the conduct. Similarly, if the result would have occurred without the conduct complained of, such conduct cannot be a cause in fact of that particular result." *Butler v. Dowd*, 979 F.2d 661, 669 (8th Cir. 1992).

Here, "but for" the Public Defender's failure to move for an indigency hearing, Powers would have received a hearing. Of course, we cannot conclude with absolute certainty that the municipal court would have granted Powers's motion. Robertson, 75 Tex. L. Rev. at 1774 (commenting that a showing of cause in fact does not require mathematical proof). Neither can we presume, however, that had the Public Defender advised the court that the Constitution forbids the jailing of a defendant on a fine without a judicial determination as to the defendant's ability to pay, that the court would have ignored this command. For these reasons, we conclude that the Public Defender was the cause in fact of the deprivation of Powers's rights.

(b)      *Proximate Cause*

The thornier question is whether the Public Defender's failure to act proximately caused Powers's injury. Proximate cause "is not about causation at all but about the appropriate scope of responsibility." Dobbs on Torts § 181. Proximate-cause analysis is a kind of line-drawing exercise in which we ask whether there are any policy or practical reasons that militate against holding a defendant liable even though that defendant is a but-for cause of the plaintiff's injury. *Id.*

The Supreme Court has stated that "§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" *Malley v. Briggs*, 475 U.S. 335, 345 (1986) (quoting *Monroe v. Pape*, 365 U.S. 167, 187 (1961)). Relying on this language, courts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable. *See, e.g., Kerman v. City of New York*, 374 F.3d 93, 126-27 (2d Cir. 2004) (holding that even where it was a hospital's doctors who decided to admit the plaintiff for psychiatric observation, the police officer who took the plaintiff to the hospital was nonetheless subject to liability under § 1983 because it was foreseeable that the plaintiff would be detained at the hospital as a result of the officer's taking him there); *Warner v. Orange County Dept. of Probation*, 115 F.3d 1068, 1072-74 (2d Cir. 1996) (holding that in recommending that the plaintiff be sentenced to an alcohol-treatment program that incorporated religious elements, a probation department could be held liable under § 1983 for violating the plaintiff's First Amendment rights, even though a judge made the sentencing decision).

Powers argues that it was reasonably foreseeable that he would be jailed without an indigency hearing when his counsel did not move for such a hearing, and that therefore the Public Defender was the proximate cause of his injury. In contrast, the Public Defender argues that the duty to hold the indigency hearing rested exclusively with the municipal judge, irrespective of the

quality of the Public Defender's representation.  Therefore, contends the Public Defender, the municipal judge was the "moving force" behind the violation of Powers's rights.[1]

We reject the Public Defender's attempt to evade liability by shifting to the municipal judge all responsibility for the alleged infringement of Powers's rights.  As an initial matter, courts do not typically issue rulings on matters not brought to their attention by the parties, and in some instances, it may even be improper for courts to do so.  *Galvan v. Ala. Dep't of Corr.*, 397 F.3d 1198, 1204 (9th Cir. 2005) ("Courts generally do not decide issues not raised by the parties.").  Moreover, busy judges, faced with lengthy and growing dockets, necessarily must rely on litigants to present the relevant facts and law governing the disputes that the judges are asked to resolve.  Powers is therefore right when he contends that the Public Defender's silence about his asserted indigency made it reasonably foreseeable that he would be jailed for non-payment of his fine without having received an indigency hearing.

We recognize that in some circumstances, the actions of a judge may sever the chain of causation between a plaintiff's injury and a defendant's wrongdoing.  *See, e.g., Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999) (holding that police officers could not be held liable for an illegal search and seizure because the plaintiff's injury was proximately caused by the trial judge's error in failing to suppress the seized evidence).  Thus, even if it is foreseeable that a defendant's conduct will lead to the complained of harm, a defendant may be able to avoid § 1983 liability by pointing to the intervening action of a judge as the proximate cause of the plaintiff's injury.  This rule has grown out of the general tort principle that "an intervening act of a third party, which [causes harm] after the first person's wrongful act has been committed, is a superseding cause which prevents the first person from being liable [even though the first person's conduct] was a substantial factor in bringing about" the harm.  *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing Restatement (Second) of Torts § 440-41 (1965)).

To determine whether a judicial act constitutes a superseding cause that relieves a defendant of liability, our sister circuits have distinguished between judicial orders that are predicated on the misrepresentation or omission of material facts, on the one hand and, on the other hand, judicial orders that are made after a full presentation of the facts, but are nonetheless legally erroneous.  In the first case, the inaccurate portrayal of the factual circumstances subjects the defendant to § 1983 liability.  Only in the latter case, where the defendant has fully apprised the judge of the material facts, but the judge has misapplied the law, will the defendant be shielded from liability.  Two cases illustrate the point.

In *Egervary*, the plaintiff father brought a *Bivens* action (the § 1983 counterpart for actions against federal officials) against the defendants, his estranged wife's attorneys.  The plaintiff argued that the defendants violated his due-process rights by persuading a judge to enter an order authorizing the removal of the plaintiff's son to Hungary, where the plaintiff's wife was living, in the absence of any hearing at which the plaintiff could contest the loss of custody.  The Third Circuit stated that "[t]he purported misrepresentation here . . . is a legal one and not an inadequate or false representation of the factual basis upon which the legal ruling depended."  *Egervary*, 366 F.3d at 249.  Because the judge had not been "misled in some manner as to the relevant facts," but instead had made a legal error for which "the judge and the judge alone was responsible," the *Egervary* Court held that the judge's order constituted a superseding cause that broke the chain of causation, thereby preventing the defendants from being held liable.

---

[1]Powers did not sue the municipal court judge who ordered him jailed presumably because any such claim would have been dismissed since judges enjoy absolute immunity for actions carried out pursuant to their official duties.  *Stump v. Sparkman*, 435 U.S. 349 (1978).

Similarly, in *Murray v. Earle*, the plaintiff brought suit on the grounds that the defendants violated her Fifth Amendment rights by illegally interrogating her. 405 F.3d 278 (5th Cir. 2005). The defendants argued that they could not be held liable because the plaintiff's injury was proximately caused by the trial judge's decision to admit her confession into evidence, not their unlawful interrogation. The Fifth Circuit agreed. The court stated that "[the plaintiff] has not identified, and we have not found, any evidence in the record to indicate that the state judge who presided over her juvenile trial failed to hear (or was prevented from hearing) all of the relevant facts surrounding her interrogation before deciding to admit her confession into evidence." *Id.* at 294. Therefore, because the plaintiff's injury was caused by the trial judge's erroneous failure to suppress her confession, the defendants were shielded from liability, notwithstanding their own wrongful conduct. *But cf. Malley*, 475 U.S. at 345 (holding that a police officer who applied for a warrant without probable cause could not evade liability under § 1983 for the unlawful arrest by arguing that it was the judge's issuance of the warrant that caused the plaintiff's injury, rather than the officer's conduct).

Here, there is no dispute that the Public Defender did not present the municipal judge with any information about Powers's financial status. Without the Public Defender stepping forward to alert the court to Powers's alleged indigency, the court had no way of knowing that indigency was an issue germane to its sentencing determination. True, the municipal judge had a duty to independently ascertain the relevant governing law, i.e., to know that he could not commit Powers to jail for non-payment of a fine if Powers was actually indigent. But the municipal judge did not have an independent duty to unearth facts establishing whether Powers was indeed indigent. Such a factual investigation was the responsibility of Powers's counsel. It was the Public Defender's duty to marshal the facts establishing Powers's indigency including, under Ohio law, Powers's income, assets, and debts, and bring them to the attention of the municipal court. O.R.C. § 2947.14. Having failed to do so, the Public Defender left the municipal judge with the misleading impression that Powers's financial circumstances did not need to be investigated prior to incarcerating him on the unpaid fine. We hold, therefore, that the municipal court's commitment order did not break the chain of causation. The Public Defender may be held liable as the proximate cause of Powers's injury.

### 4. *The Public Defender Acted Under Color of State Law*

The Public Defender argues that it is not a state actor for purposes of § 1983 liability, *see Georgia v. McCollum*, 505 U.S. 42, 53 n.9 (1992) (stating that the "state actor" and "acting under color of state law" inquiries are the same), because, under *Polk County v. Dodson*, 454 U.S. 312, 325 (1981), public defenders do not "act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding." Reasoning that requesting indigency hearings is among these "traditional functions"—similar to "enter[ing] 'not guilty' pleas, mov[ing] to suppress State's evidence, object[ing] to evidence at trial, cross-examin[ing] State's witnesses, and mak[ing] closing arguments in behalf of defendants"—the Public Defender contends that it is immune to liability. *Polk County*, 454 U.S. at 320.

The Public Defender reads the holding of *Polk County* too broadly. The issue there was whether an individual attorney, employed by the county public-defender agency, acted under color of state law in her representation of the defendant. The Supreme Court rejected the argument that a public defender is a state actor merely because he or she is an employee of the state. *Id.* at 319-22. Moreover, the Supreme Court held that our adversarial system of justice and a lawyer's ethical duties to a client compel the conclusion that a public defender is not an instrument of the state, but an independent agent of the client's interests. *Id.*

Significantly, the *Polk County* Court did not hold that a public defender never acts under color of state law. *See McCollum*, 505 U.S. at 54 ("the determination whether a public defender is

a state actor for a particular purpose depends on the nature and context of the function he is performing"). Indeed, the Court articulated two propositions that are relevant here. First, the Court stated that "[i]t may be . . . that a public defender also would act under color of state law while performing certain administrative and possibly investigative functions." *Polk County*, 454 U.S. at 325. Second, the Court noted that, in addition to his particular public defender, the plaintiff had named as defendants Polk County, the Polk County Offender Advocate (the equivalent of the Public Defender here), and the Polk County Board of Supervisors. *Id.* at 325-26. The Court held that although the plaintiff's pleading was insufficient to state a § 1983 claim for relief against the County defendants, it left open the possibility that the result might have been different had the plaintiff alleged the existence of an unconstitutional policy. *Id.* at 326.

The first question then is whether the Public Defender's purported policy of failing to seek indigency hearings on behalf of its clients falls within the "administrative" exception alluded to in *Polk County*. We conclude that it does.

Powers alleges that the Public Defender engages in an across-the-board policy or custom of doing nothing to protect its indigent clients' constitutional rights not to be jailed as a result of their inability to pay court-ordered fines. Unlike the plaintiff in *Polk County*, Powers does not seek to recover on the basis of the failures of his individual counsel, but on the basis of an alleged agency-wide policy or custom of routinely ignoring the issue of indigency in the context of non-payment of fines. Although we acknowledge that requesting indigency hearings is within a lawyer's "traditional functions," the conduct complained of is nonetheless "administrative" in character for the reasons already described: Powers maintains that the Public Defender's inaction is systemic and therefore carries the imprimatur of administrative approval.

It is by no means clear that the Supreme Court intended to suggest a strict dichotomy between "administrative" practices of a public defender that may be deemed state action and "traditional functions" of a public defender, which may not. Stated differently, we do not read *Polk County* to mean that in using the term "administrative," the Supreme Court meant to limit a finding of state action only to managerial tasks, such as hiring, firing, and resource allocation, which are different in kind from the "traditional functions" of a lawyer representing a client. *See Polk County*, 454 U.S. at 325 (citing *Branti v. Finkel*, 445 U.S. 507 (1980) for the proposition that a public defender acts under color of state law when making hiring and firing decisions); *Miranda v. Clark County, Nevada*, 319 F.3d 465 (9th Cir. 2003) (en banc) (holding that a public defender acted under color of state law in allocating resources to cases based on the results of polygraph tests routinely administered to clients). If that were the case, then a public-defender agency that adopted a policy, or acquiesced to a custom, of refusing to cross-examine the State's witnesses would be immune to § 1983 liability—notwithstanding the obvious unconstitutionality of such a policy or custom—because cross-examining witnesses falls within the "traditional functions" of a lawyer.

Any doubt about whether the alleged policy or custom here constitutes state action is eliminated by the second consideration articulated in *Polk County*. As mentioned above, the Supreme Court did not decide whether the defendant in *Polk County* would have satisfied the state-action requirement if he had pleaded the existence of an unconstitutional policy. Here, Powers has done that very thing. He argues that the Public Defender systematically violates class members' constitutional rights by failing to represent them on the question of indigency. Given the reasoning of *Polk County*, it makes sense to treat this alleged policy or custom as state action for purposes of § 1983. The existence of such a policy, if proven, will show that the adversarial relationship between the State and the Public Defender—upon which the *Polk County* Court relied heavily in determining that the individual public defender there was not a state actor—has broken down such that the Public Defender is serving the State's interest in exacting punishment, rather than the interests of its clients, or society's interest in fair judicial proceedings.

For these reasons, we hold that Powers satisfies the state-action requirement.

5.       *The Record Reveals a Genuine Issue of Material Fact Regarding the Existence of the Alleged Policy or Custom*

In its order denying summary judgment for the Public Defender, the district court stated that "it is clear to the Court that the Public Defender Commission and the Hamilton County Public Defender had a well-settled custom or policy of not asking for an indigency hearing before a probationer is incarcerated for failure to pay a fine." (Class Cert./Summary Judgment Order at 13-14.)  In ruling on Powers's motion for summary judgment, the district court stood by its earlier conclusion, commenting: "Defendants have failed to raise a genuine issue of material fact as to the existence of such a policy . . . There is no question in the Court's view that indigent defendants represented by the Hamilton County Public Defender were jailed on fines that they were unable to pay."[2]  (Order on Powers's Motion for Summary Judgment at 19.)

To establish the existence of the alleged policy or custom, Powers presented several different types of evidence, including the record of the proceedings in his own case, affidavit testimony about what the "judges' sheets" in numerous cases show, seven transcripts of court proceedings, and an excerpt from judicial meeting minutes.[3]  Each of these will be discussed in turn.

First, the record in Powers's own case does not reflect that his counsel asked for a hearing into his ability to pay the court-ordered fine and costs, either at the entry of his no-contest plea to the underlying reckless-driving charge, or at the hearing on his probation violation for failing to pay the fine and costs. (JA 129-32.)  Indeed, at Powers's probation hearing, the judge recited Powers's purported probation violations, including the non-payment of the fine and court costs and asked Powers's counsel if he had anything to say on behalf of his client.  Powers's counsel responded, "[n]othing, Judge." (JA 130.)

Second, Powers submitted the affidavit testimony of John Weber, who avers that he researched the cases of persons incarcerated for non-payment of fines by reviewing the records in their proceedings through the Hamilton County Clerk of Courts office.  Weber based his research

---

[2]Powers argues that the Public Defender has waived any argument about whether Powers is entitled to summary judgment as to the existence of the alleged policy or custom because the Public Defender failed to sufficiently develop this argument in its appellate briefing.  We disagree.  Although the Public Defender does not explain what inferences should be drawn in its favor as the non-moving party, it does adequately point to the record evidence tending to show, in its view, that there is no policy or custom of violating the constitutional rights of its clients by failing to seek indigency hearings, or that, at a minimum, there is a genuine issue of material fact as to its existence.

[3]None of Powers's evidence satisfies the standards of Federal Rule of Civil Procedure 56 for evidence submitted in support of summary judgment.  Rule 56(e) provides as follows: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Neither the hearing transcripts, nor the excerpt from the judicial meeting minutes are attached to an affidavit explaining how they were obtained, from where, or by whom.  Similarly, Weber's affidavit (discussed *infra*) does not show that he "is competent to testify to the matters" he describes because he does not identify himself, explain his professional background or skills, or in what capacity he was serving when he undertook to research the court records he describes. Despite these glaring deficiencies, we may still consider Powers's evidence because the Public Defender did not object to its competence below (or on appeal, for that matter).  *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and we will review such objections only to avoid a gross miscarriage of justice."); *Carter v. Western Reserve Psychiatric Habilitation Ctr.*, 767 F.2d 270, 273 n.2 (6th Cir. 1985) (per curiam) ("Although the district court may have erred in basing its holding . . . on unsworn affidavits and uncertified copies of documents attached as exhibits to appellees' motion for summary judgment, since such materials do not comport with the requirements of Fed. R. Civ. P. 56(e), we are satisfied that essential justice was done.").

on a list of persons who were jailed between August 21, 2000, and August 21, 2002, for failure to pay fines. The list was compiled at the direction of the Hamilton County Prosecutor and produced to Powers in discovery. The list is twenty-three pages long and Powers says it consists of approximately 1000 names.

Weber avers that he researched names on only the first four pages of the list. Weber obtained the "judges' sheets" in some unspecified number of cases. These judges' sheets, according to Weber, "contain the entries made by the judges" disposing of the matters before them. (JA 142-43.) Weber testified that in thirty-two cases, the judges' sheets simply ordered the defendants' "commit[ed] on fines" and in no case reflected any findings of fact into the offender's income, assets, debts, and ability to pay the fine, as required by O.R.C. § 2947.14. (JA 143.)

Powers submitted the judges' sheets from four cases, which were presumably retrieved by Weber pursuant to his research. None of these judges' sheets reflect an inquiry into the offenders' ability to pay the court-imposed fine.

Third, Powers presented seven transcripts of hearings in which the court ordered the defendants to pay a fine for their infractions, or ordered them jailed for their failure to pay. In no case do the transcripts show that the defendants' counsel objected to the imposition of a fine on indigency grounds or asked for an inquiry into their clients' ability to pay. One transcript shows that the defendant's counsel asked the court to commit his client because the client "[c]an't afford to pay." (JA 148-49.)

The last piece of evidence Powers submitted was an excerpt from what appear to be meeting minutes from 1982, in which Judge Timothy Hogan, who chaired the Standing Criminal Committee at that time, reported on his committee's efforts to protect against the jailing of indigent persons for non-payment of fines:

> Judge Hogan informed the Judges assembled of a letter from Robert Newman, Legal Aid Director, challenging the incarceration of defendants for fines if they are indigent. He reported that Judge Albanese had chaired a special committee which met on June 23rd and the committee instructed the Court Administrator, Mr. Schweiker, to draft a procedure to eliminate the problem.

(JA 74.)

As described above, the district court concluded that this evidence was sufficient to unequivocally establish that the Public Defender has a policy or custom of failing to seek indigency hearings on behalf of its clients threatened with incarceration for non-payment of fines.

We disagree with the district court and instead conclude that Powers's evidence is insufficient to show a "clear and persistent pattern" of abuse that the Defendants knew about and acquiesced in sufficient to entitle Powers to summary judgment as a matter of law. *Doe*, 103 F.3d at 508; *but see Alkire*, 330 F.3d at 818 (plaintiff's evidence showing that no ability-to-pay determination was made in his case or in nine other cases was sufficient to *defeat* summary judgment). In particular, it is difficult to assess the probative value of what would seem to be Powers's strongest piece of evidence, namely, Weber's testimony, because Weber's affidavit is inartfully drawn. By our count, there are 174 names of incarcerated individuals on the four pages of the list that Weber consulted. Weber testifies that in thirty-two cases, the judges' sheets suggest that no inquiry into the offenders' ability to pay was conducted. However, Weber does not state that if indigency hearings were requested or held, the judges' sheets would be the court record, as opposed to some other document, that noted this fact. Moreover, Weber does not state (1) whether he researched the records in the cases of all 174 persons listed and indigency hearings were not held

in only thirty-two, giving rise to the inference that they occurred in the remaining 142 cases; (2) whether he simply randomly selected thirty-two of the 174 names; or (3) whether he could obtain information on only thirty-two cases because the court records in the other cases were not available. In short, without a context as to why Weber's findings were limited to thirty-two cases, we cannot conclude that his testimony confirms the existence of the Public Defender's alleged policy or custom.

Although it is clear that Powers has not satisfied his summary judgment burden, the Public Defender does not controvert any of Powers's evidence, except for the seven hearing transcripts Powers submitted. The Public Defender does not dispute that Powers never received an indigency hearing, nor does the Public Defender challenge Weber's testimony that the court records in thirty-two cases between 2000 and 2002 did not reflect any inquiry into the offenders' ability to pay court-ordered fines before they were incarcerated for non-payment. As to the seven hearing transcripts, the Public Defender argues that two of the defendants there were not represented by the Public Defender, that one defendant's fine was obviated by jail time already served, and that three other defendants' indigence was reported to the court.

Although it generally does not attack Powers's evidence, the Public Defender adduced evidence of its own, which it claims shows that the purported policy does not exist or, at a minimum, gives rise to a genuine issue of fact as to its existence. The Public Defender's evidence consists of affidavit testimony from the current Hamilton County Public Defender and head of the Public Defender's office, Lou Stringari, and identical, form affidavits from fourteen Public Defender staff attorneys. Taken together, this evidence stands for the proposition that assistant public defenders comply with their professional obligations to advocate on behalf of their clients' best interests and that they take into account a myriad of factors in assessing how best to represent a client facing a monetary penalty. Finally, the Defendants submitted an affidavit from Mary W. Sullivan, the Chairperson of the Public Defender Commission, in which she avers that the Commission does little more than oversee the budgetary needs of the Public Defender's office.

First, Stringari testifies that he has served as the Hamilton County Public Defender since 1994. He explains that the Office of the Public Defender employs staff attorneys as assistant public defenders and also contracts with private-sector attorneys "on an on-call basis." (JA 331.) He further testifies that,

> The office of the County Public Defender does not direct or control the actions of either its staff attorneys or the attorneys operating on a contract basis in the municipal division [i.e., the division that represents perons charged with misdemeanors in municipal court] with respect to tactical decisions made in the representation of individual clients. The office expects that each attorney working for it will represent their clients in a professional manner and exercise independent judgment in the best interest of the represented clients consistent with standards established by the Supreme Court of Ohio in its Code of Professional Responsibility.

(JA 332.)

The affidavits submitted by the fourteen assistant public defenders are identical in substance. All of these attorneys aver that "[w]hen making decisions regarding the representation of an individual client, I am governed by the best interests of my client and my oath as a lawyer." (JA 338-379.) They further testify, verbatim, as to the nature of their representation when their clients are facing fines:

> When a monetary fine is a component of a sentence the discussion of how to proceed includes:
>
> the ability of the client or someone else to pay the fine and reasons for prior non-payment;
> whether they are being held on other charges;
> if the jail is at capacity, a commitment on a fine may result in an immediate release;
> resolution of the fine may result in early termination of probation;
> if credited with time served, an immediate release may result;
> the possibility of a commitment concurrent with a jail sentence associated with the same or a different offense.

(JA 378-79.)

Importantly, neither Stringari, nor the individual staff attorneys, testify that they request indigency hearings where appropriate, including to fend-off possible incarceration for non-payment of fines. In addition, although the staff attorneys aver that they take into account certain tactical considerations when their clients are facing monetary penalties, they do not explain if, or how, these considerations affect their analysis of whether to ask for an indigency hearing. Finally, the Public Defender did not submit any court records showing that it has sought indigency hearings in order to counter the court records submitted by Powers showing that it has not.

As described above, we conclude that Powers has not submitted sufficient evidence entitling him to summary judgment. Even if his evidence were sufficient, however, we would still reverse the district court's judgment on the grounds that the Public Defender has raised a genuine issue of material fact at to the existence of the purported policy or custom of failing to seek indigency hearings. Drawing all reasonable inferences in favor of the Public Defender, the Stringari affidavit and those of the staff attorneys could be read as averring that in some circumstances, the best interests of the client are served by not seeking an inquiry into his/her ability to pay a court-ordered fine. For instance, a public defender may counsel her client to accept a commitment on a fine because the public defender knows that the jail is full and her client therefore will not actually serve any time. (JA 378 ("if the jail is at capacity, a commitment on a fine may result in an immediate release").) Similarly, if jail time on a fine can be served concurrent with another sentence, then challenging the fine on indigency grounds may only expose the client to an alternative and additional penalty, such as community service. (JA 378-79 ("the possibility of a commitment concurrent with a jail sentence associated with the same or a different offense").) The same analysis may apply if the client is "being held on other charges." (JA 378.) Thus, strictly speaking, defendants may sustain a deprivation of their constitutional rights but, in some proportion of cases, that deprivation may be immaterial because not asking for an indigency hearing, and simply accepting a commitment for non-payment of a fine, may be more beneficial to the client than requesting the hearing. Given the tension here between the constitutional rights at stake and a lawyer's ethical duty to represent her client's best interests, further factual development in the district court is needed.

Accordingly, we reverse the district court's grant of summary judgment for Powers and remand for further proceedings.

## E.        The District Court did not Err in Certifying a Class

The district court granted Powers's motion for class certification, concluding that the requirements spelled out in Federal Rule of Civil Procedure 23 have been satisfied. We review a class-certification determination for an abuse of discretion. *Barney v. Holzer Clinic, Ltd.*, 110 F.3d

1207, 1213 n.9 (6th Cir. 1997). "A district court that either uses the wrong legal standard or misapplies the correct legal standard abuses its discretion." *Id.* For the reasons described below, we affirm the district court's grant of class certification but modify the class definition to exclude persons who were not represented by the Public Defender.

A class action cannot be certified unless the numerosity, commonality, typicality, and adequacy requirements of Rule 23 are met. In other words, the plaintiff must show that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the class representative are typical of the claims or defenses of the class, and (4) the representative party will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In addition, the plaintiff must satisfy one of the subsections of Rule 23(b). Here, Powers moved for certification under Rule 23(b)(3), which demands a showing that questions of law or fact common to the class predominate over questions affecting only individual class members.

The district court certified a class consisting of:

> [a]ll persons who, without an indigency hearing, were committed to the custody of a Hamilton County correctional facility by a Hamilton County municipal or common pleas court from August 21, 2000, to the present in satisfaction of a fine and/or court costs, including persons who violated probation following a 'stay to pay' sentence.

(Final Judgment Order at 1.)

On appeal, the Public Defender argues that the district court erred in certifying the class because Powers has failed to satisfy Rule 23(a)'s commonality and typicality requirements and has further failed to satisfy Rule 23(b)(3)'s predominance requirement.

As an initial matter, we conclude that, as presently defined, the class is overbroad because it is not limited to persons who were represented by the Public Defender, but instead encompasses "[a]ll persons who, without an indigency hearing, were committed to the custody of a Hamilton County correctional facility . . . ." The Public Defender cannot be held liable for harm to persons that it did not cause. Therefore, we will modify the class definition to exclude persons who proceeded *pro se* or who were represented by attorneys other than public defenders. *See Barney*, 110 F.3d at 1214-15 (modifying the class definition on appeal to conform to the parties' arguments); *In re Chiang*, 385 F.3d 256, 268-69, 272 (3d Cir. 2004) (modifying the class definition on appeal to reflect the plaintiffs' focus on national-origin discrimination and to eliminate an improper subjective element of the class definition). Accordingly, the class will now be defined as:

> [a]ll persons who were represented by the Office of the Hamilton County Public Defender, and who, without an indigency hearing, were committed to the custody of a Hamilton County correctional facility by a Hamilton County municipal or common pleas court from August 21, 2000, to the present in satisfaction of a fine and/or court costs, including persons who violated probation following a 'stay to pay' sentence.

With this revised class definition in mind, we proceed to consider the Public Defender's arguments challenging class certification.

First, the Public Defender contends, without any explanation, that Powers is not typical of the class he seeks to represent. To satisfy the typicality requirement, the representative plaintiff's interests must be aligned with those of the class. *Sprague v. GMC*, 133 F.3d 388, 399 (6th Cir.

1998) (en banc) (citing Herbert B. Newberg & Alba Conte, Newberg on Class Actions, § 3-13, at 3-75, 76 (3d ed. 1992)). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *In re Am. Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996).

The Public Defender does not dispute that Powers was committed to jail for failing to pay a court-ordered fine and that his counsel did not seek an indigency hearing at any time prior to his incarceration. The Public Defender also does not dispute that the class certified by the district court consists of similarly situated persons who were incarcerated for their non-payment of fines in the absence of an inquiry into their ability to pay those fines. It therefore cannot be said that Powers is not typical of the class he seeks to represent.

Second, the Public Defender argues that neither the commonality, nor the predominance requirements are satisfied because there are too many variations in the experiences of individual class members to make class treatment of their claims appropriate. Notably, the Public Defender does not explain what these purported "variations" are.

The commonality requirement is satisfied if there is a single factual or legal question common to the entire class. *Am. Med. Sys.*, 75 F.3d at 1080. The predominance requirement is met if this common question is at the heart of the litigation. "[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Cases alleging a single course of wrongful conduct are particularly well-suited to class certification. *Id.* Here, Powers has alleged that the Public Defender engaged in an ongoing and regular practice of failing to seek indigency hearings for criminal defendants facing incarceration for non-payment of fines. Powers has asserted a single factual theory of wrongdoing and seeks to recover based on the single legal claim that the Public Defender's practice violated class members' due process rights. The dispositive facts and law are the same as to each class member. This is sufficient to satisfy both the commonality and predominance requirements.

Finally, the Public Defender appears to criticize the district court's repeated modification of the class definition but does not go so far as to contend that this amounted to reversible error, nor could it. As demonstrated by our own clarifying revision to the class definition, courts must be vigilant to ensure that a certified class is properly constituted. More to the point, district courts have broad discretion to modify class definitions, so the district court's multiple amendments merely showed that the court took seriously its obligation to make appropriate adjustments to the class definition as the litigation progressed. *See, e.g. Schorsch v. Hewlett-Packard Co.*, 417 F.3d 748, 750 (7th Cir. 2005) (noting that "[l]itigants and judges regularly modify class definitions"); *In re Monumental Life Ins. Co.*, 365 F.3d 408, 414 (5th Cir. 2004) ("District courts are permitted to limit or modify class definitions to provide the necessary precision.").

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's conclusion that Powers's § 1983 claims are cognizable and also **AFFIRM** the grant of class certification. We **REVERSE** the district court's judgment that Powers is entitled to summary judgment as a matter of law, and **REMAND** for further proceedings consistent with this opinion.

———————————

## DISSENT

———————————

ALAN E. NORRIS, Circuit Judge, dissenting.  While I agree with much of the majority's opinion, we part company on what it properly recognizes to be the "thorny question" of causation, specifically proximate cause.  Maj. Op. at 12.  The Ohio Revised Code places the duty squarely upon the court to hold a hearing into a defendant's financial resources before committing him to a jail or workhouse for failure to pay a fine.  Ohio Rev. Code § 2947.14.[1]  In a perfect world, defense counsel should remind the court of its statutory obligation, particularly when it is in the best interest of his or her client.[2]  However, simply because judges face lengthy and growing dockets does not excuse them from fulfilling a statutory duty, as the majority suggests.  Nor may a court refrain from inquiring into an issue that has not been raised by the litigants when a statute commands it.  This court, for instance, has an independent duty to examine the basis of its jurisdiction regardless of whether the parties have briefed the issue.  Accordingly, it seems to me that the majority is in error when it concludes that the trial court's breach of its duty does not sever the "chain of causation" between plaintiff's injury and defendant's alleged wrongdoing.  Maj. Op. at 13.

In cases of outright misrepresentation by defense counsel, I agree with the majority that an erroneous ruling on the part of the court would not serve as a superseding cause.  That is not the case here, however.  The majority states that "there is no dispute that the Public Defender did not present the municipal judge with any information about Power's financial status."  Maj. Op. at 14.  On the contrary, counsel informed the court that "Mr. Powers is homeless and can't come up with any bond," which put the court on notice that an indigency hearing was necessary if the court intended to confine Powers for nonpayment of his fine.[3]  It is hard for me to fathom how counsel's statement, as the majority would have it, "left the municipal judge with the misleading impression that Power's financial circumstances did not need to be investigated prior to incarcerating him on the unpaid fine."  Maj. Op. at 14.  In short, I find nothing in this record to support the majority's conclusion that the Public Defender, not the court, proximately caused Power's alleged constitutional injury.

I respectfully dissent.

———————————————

[1]This statute, which addresses the requirements outlined in *Bearden v. Georgia*, 461 U.S. 660, 667 (1983), provides in part as follows:

> If a fine is imposed as a sentence or a part of a sentence, the court or magistrate that imposed the fine may order that the offender be committed to the jail or workhouse until the fine is paid or secured to be paid, or the offender is otherwise legally discharged, if *the court or magistrate* determines at a hearing that the offender is able, at that time, to pay the fine but refuses to do so. The hearing required by this section shall be conducted at the time of sentencing.

Ohio Rev. Code § 2947.14(A) (emphasis added).

[2]As the majority notes, there may be scenarios where requesting a hearing is not in the best interest of the client, Maj. Op. at 39, which may help to explain why the statutory scheme places the duty to inquire on the court.

[3]The fact that Powers was represented by the Public Defender in the first place likewise provided a clear signal to the court that his financial resources were limited.