**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0175n.06

**No. 11-4077**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
***Feb 14, 2013***
DEBORAH S. HUNT, Clerk

ARLINGTON VIDEO PRODUCTIONS, INC.,

      Plaintiff – Appellant,

v.

FIFTH THIRD BANCORP,

      Defendant – Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

**OPINION**

Before: ROGERS and STRANCH, Circuit Judges; PEARSON, District Judge.[*]

**JANE B. STRANCH, Circuit Judge.** Arlington Video Productions, Inc. ("Arlington") filed suit against Fifth Third Bank ("the Bank")[1] alleging individual and class claims for breach of the Bank's contractual obligation to inform customers in advance that certain service fees would be charged to their accounts. The district court denied Arlington's motion for class certification and subsequently granted the Bank's motion for summary judgment on Arlington's individual claim. Arlington appeals both decisions. We conclude that the district court erred in granting summary judgment in favor of the Bank on Arlington's individual claim and in denying class certification

---

[*]The Honorable Benita Y. Pearson, United States District Judge for the Northern District of Ohio, sitting by designation.

[1]Arlington's original Complaint incorrectly identified the defendant as Fifth Third Bancorp, a holding company. The proper defendant is Fifth Third Bank, *id.*, as specified in Arlington's First Amended Class Action Complaint.

1

under Federal Rules of Civil Procedure 23(a) & (b)(3). Because it is the district court's prerogative to define the class in accordance with this opinion and to make any refinements to the class definition that may be necessary to manage the litigation, we **REVERSE** and **REMAND** for further proceedings.

## I. FACTS

Arlington is an Ohio corporation that provides video services to clients. Arlington's sole shareholder is Evan Newman, who at all times conducted Arlington's business affairs. The Bank is an Ohio corporation conducting business in twelve states: Ohio, Kentucky, Michigan, Tennessee, Indiana, Illinois, Missouri, Pennsylvania, West Virginia, North Carolina, Georgia, and Florida.

Arlington opened a business checking account with the Bank on August 3, 2000, known as a Business 5/3 account. Newman signed a signature card that included seven paragraphs of "TERMS AND CONDITIONS," the first two of which read:

> 1.     The terms and conditions stated herein, together with resolutions or authorizations which accompany this signature card, if applicable, and the Rules, Regulations, Agreements, and Disclosures of Bank constitute the Deposit Agreement ("Agreement") between the individual(s) or entity(ies) named hereon ("Depositor") and the Bank.
>
> 2.     This Agreement incorporates the Rules, Regulations, Agreements, and Disclosures established by Bank from time to time, clearing house rules and regulations, state and federal laws, recognized banking practices and customs, *service charges as may be established from time to time* and is subject to laws regulating transfers at death and other taxes.

R. 83-1, Page ID 3303 (emphasis added). When Newman signed the signature card, Arlington granted the Bank a security interest in the account and agreed to allow the Bank at any time to "set off, against any balance in this account . . . any debt owed to Bank by any entity listed" on the account. *Id.* ¶ 6. Arlington further agreed to all of the specified terms and conditions listed on the

2

signature card, acknowledged receipt of a "copy of the Rules and Regulations, Agreements, and Disclosures of Bank," and further agreed "to the terms set forth therein." *Id.* ¶ 7.

The phrase "Rules and Regulations" referred to the Bank's "Rules & Regulations Applicable To All Fifth Third Accounts and Cards June 1, 2000" (hereinafter "Rules & Regulations"). R. 83-1, Page ID 3304–3338. Paragraph 9 of that document provided:

> These Rules and Regulations, *as well as fees and charges contained on the Fee Schedule* may be altered or amended at any time by the Bank and as altered or amended shall be binding on all Customers after having been made available in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law.

*Id.*, Page ID 3307 (emphasis added). Paragraph 23 of the document specifically concerned a "returned item fee" and provided: "When a deposited item is returned unpaid and charged back to your account, the Bank reserves the right to charge a returned item fee." *Id.,* Page ID 3310. The Rules & Regulations also included a "Fee Schedule," which listed the fee amounts to be charged for at least twelve different bank services, but it did not include the "returned item fee" mentioned in paragraph 23 of the Rules & Regulations, nor did it list a "deposit adjustment fee" or the amount to be charged for that fee. *Id.*, Page ID 3334. As Newman later learned, the Bank charged a "deposit adjustment fee" if a business customer tendered multiple items for deposit, but totaled the items incorrectly, requiring a bank employee to reconcile the deposit. Between August 2000, when Arlington opened its account, and December 2007, when Arlington filed this lawsuit, the Bank issued revised versions of the Rules & Regulations.

On several occasions beginning in January 2001 and continuing through early 2007, the Bank posted a non-itemized "service charge" on Arlington's monthly account statement and deducted the amount of that charge from Arlington's account. Upon receiving many of these statements, Newman

3

visited the Bank to inquire about the service charge. He learned that a "service charge" is comprised of separate fees. The two most often at issue were the "deposit adjustment fee" and the "returned item fee." Although Newman asked Bank employees to produce documentation confirming that Arlington's business account was subject to a "deposit adjustment fee," the Bank could not present any such writing. On most, if not all, of these occasions, Newman asked the Bank to reverse the service charges, and the Bank did so. According to Newman, the Bank reversed the service charges either because the Bank could not determine what the charges were for or the Bank could not produce any documents to confirm that the fees applied to Arlington's account. The Bank asserts that it waived the service charges as a courtesy to its customer.

In January 2007, the Bank sent Arlington a letter asking it to choose one of three business checking accounts listed in the letter. The Bank indicated its intent to assign Arlington to one of the three accounts starting that month if Arlington did not make a choice. Arlington did not make an election, and the January 2007 statement revealed that the Bank had placed Arlington in a "Business Preferred Checking" account. Newman later changed the account to a "Business Advantage" account and then to a "Business Basics" account. He did not execute any new documents when these changes were made, nor did he receive any documentation relating to the changes to the account.

In June 2007 the Bank revised the Rules & Regulations. The paragraph referring to fees and charges, now paragraph 8 instead of paragraph 9, provided:

> These Rules and Regulations, *as well as fees and charges contained on the Fee Schedule associated with your account(s)* may be altered or amended at any time by the Bank and as altered or amended shall be binding on all Customers after having been made available in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law.

Appellant's App'x, Vol. 1 at 130 (emphasis added). Like the 2000 version of the Rules & Regulations, the 2007 version included a paragraph explaining the "returned item fee." *Id.* at 134, ¶ 21. The 2007 version did not include a "Fee Schedule," but it did have a section entitled, "SPECIAL FEES THAT APPLY TO ALL CONSUMER ACCOUNTS." *Id.* at 160–61. Listed there were approximately thirty different fees, including a charge of $10.00 for a "Returned deposited item." *Id.* at 161. The list did not include a "deposit adjustment fee."

In August 2007, Arlington received a monthly account statement for July that included a non-itemized "service charge" for $41.00. As in the past, Newman visited the Bank and asked about the service charge. The Bank provided Newman with a one-page computer printout showing that the service charge was comprised of two deposit adjustment fees of $8.00 and two returned item fees of $12.50 for a total service charge of $41.00. The Bank charged Arlington $12.50 for each "returned item fee" even though the June 2007 Rules & Regulations in effect at that time stated that the fee was $10.00. The Bank refused to waive the service charge and also did not produce on Newman's request a document confirming that the fees applied to Arlington's account.

Newman took other steps to try to locate written confirmation of the fees applicable to Arlington's account. He explored the Bank's website, but found nothing of help there. He visited several bank branches asking for written confirmation of the fees applicable to Arlington's account, but no documentation was provided. Newman thus believed that Arlington was entitled to rely on the Rules & Regulations as disclosing the fees that could be charged to Arlington's account.

The Bank charged Arlington another deposit adjustment fee in September 2007, which Newman also challenged. The Bank refused Newman's request to refund the fee, prompting Arlington to file suit against the Bank in December 2007.

5

Arlington contends that the Bank deducted fees from its account without ever providing a Fee Schedule, product brochure, or other document to verify that Arlington's account was subject to a deposit adjustment fee or to a returned item fee in excess of the amount stated for that fee in the Rules & Regulations. The only documentation the Bank produced on Newman's request was the August computer printout detailing the composition of the $41.00 fee charged in July, after the charge had already been deducted from Arlington's account.

During discovery, the Bank provided Arlington with a comprehensive list of all fees potentially applicable to Arlington's account. The Bank produced that list by culling data from a mainframe computer that is inaccessible to branch banks. Arlington asserts that the Bank's difficulty in providing the information Newman requested demonstrates that specific fee information is not readily available to business customers.

In support of its summary judgment motion, the Bank produced a variety of evidence, including the testimony of certain bank managers. According to Greg Eiting, Manager of Retail Operations, when the Bank "decides to make a business account fee change, it sends notification of the change to each of its branches at least fifteen days prior to implementation of the fee change so that the representatives at those branches can adequately discuss the fee with the customers impacted by the change." Appellant's App'x. Vol. 2 at 369. William Curry, Enterprise Program Manager, averred that the Bank "always provides information regarding fee changes for business accounts to its financial center branches at least fifteen days prior to that change becoming effective." R. 82-2, Curry Second Decl. ¶¶ 6–7. Further, the Bank "updates its branches on a weekly basis regarding new applicable fees, changes in fee amounts, effective dates of fee changes, and other information

6

concerning changes to business account fees." *Id.* Documents supporting these general statements are notably absent from the summary judgment record.

Curry further stated that the "nature and amount of the deposit adjustment fee of $6.00 was made available in the offices of [the Bank] for at least fifteen days before [the Bank] charged Arlington Video that fee," and the Bank increased the amount of that fee from $6.00 to $8.00 in January 2006. "Information regarding this change in the amount of the deposit adjustment fee was made available in the offices of [the Bank] for at least fifteen days before [the Bank] charged Arlington Video the deposit adjustment fee of $8.00." *Id.* ¶ 8. Curry attested that the returned item fee changed from $10.00 to $12.50 in January 2006,[2] and that "[i]nformation regarding this change . . . was made available" in the Bank's offices "for at least fifteen days" before the Bank charged the $12.50 fee to Arlington. *Id.* ¶ 11.

Additionally, the Bank produced testimony that it tailors the notice it gives to customers based on the specific changes being implemented and that its customers are notified of fee changes by various means, including statement inserts, letters, product brochures, signs posted in branch banks, the customer call center, and the internet. According to the Bank, Arlington never utilized the Bank's commercial call center. Further, the Bank's testimony noted that determining which service fees apply to a customer is primarily dependent on the products and services used by that customer and is unique for each customer. A business customer can determine in advance the fees that may be applicable by maintaining a Treasury Management account and negotiating the applicable fees with the Bank.

---

[2]Curry did not explain why the June 2007 Rules & Regulations listed a returned item fee of $10.00.

7

Newman testified that the Bank did not accurately list the fees applicable to Arlington's account on any Fee Schedule or in any product brochures; that Arlington did not receive any form of written notice about the fees or amendments to fees applicable to its account other than what was stated in the Rules & Regulations; that every time a service charge was deducted from Arlington's account he was required to visit the Bank to inquire what the charge was for; and that the Bank's employees could not tell him why the fees were charged because they could not figure out which fees were applicable to Arlington's account. Newman points out that the "Business Banking Product Descriptions," which are available to bank employees on the Bank's intranet for use in explaining accounts and fees to bank customers, are very complicated and expressly state that they are "For Internal Use Only," and "Note: Other fees may apply."

James Bingham, the Bank's Senior Manager of Applications Development, testified about the Bank's computer pricing methodology. To do so, he referred to documents printed from the Bank's mainframe computer that are hundreds of pages in length. Other charts in the record confirm the complex nature of the Bank's fee charges. It appears, however, that the Bank is capable of determining the number of Ohio business checking account customers who were charged a non-negotiated deposit adjustment fee since December 2002.

Arlington filed this action in December 2007 in Ohio state court. The Bank removed the lawsuit to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d). In a First Amended Complaint, Arlington asserted individual and class claims for violations of the Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. § 4165.02(A)(11), breach of contract and the duty of good faith and fair dealing, and unjust enrichment. Arlington generally alleges that the Bank can charge a business customer fees for services as long as those fees are disclosed in writing to the

customer before they are deducted from the account. On the Bank's motion, the district court dismissed all claims with the exception of the breach of contract claim. Following discovery, the court denied Arlington's motion for class certification and, on cross-motions for summary judgment, the district court entered judgment in favor of the Bank on Arlington's individual claim. Arlington timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.

## II. ANALYSIS

Our first task is to review the grant of summary judgment to the Bank on Arlington's breach of contract claim. Concluding that summary judgment was improperly granted on the individual claim, we then turn to Arlington's motion for class certification and determine that the motion should have been granted in part and denied in part.

## A. Individual breach of contract claim

### 1. Standard of Review

We examine de novo a district court's grant of summary judgment. *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). We consider summary judgment properly granted if the "movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The factual evidence, as well as the reasonable inferences drawn from the evidence, are viewed in favor of the nonmoving party. *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003). A genuine issue of material fact exists for trial "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

9

*2. Breach of contract under Ohio law*

To prevail on a claim for breach of contract under Ohio common law, Arlington must prove the following elements by a preponderance of the evidence: (1) a contract existed, (2) Arlington fulfilled its contractual obligations, (3) the Bank failed to fulfill its contractual obligations, and (4) Arlington incurred damages as a result of the Bank's failure. *See Langfan v. Carlton Gardens Co.*, 916 N.E.2d 1079, 1087 (Ohio Ct. App. 2009). Construction of a written contract, including the determination of whether the contract's terms are ambiguous, is a question of law for the court, and in making our inquiry we give effect to the intent of the parties in making the contract. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008); *Beasley v. Monoko, Inc.*, 958 N.E.2d 1003, 1011 (Ohio Ct. App. 2011). The parties' intent is presumed to lie in the language they used in their agreement. *Beasley*, 958 N.E.2d at 1011. We must read the contract as a whole and give effect to every part of it, if possible. *See id.*

If the parties dispute the meaning of their contract, the court first considers the four corners of the document to decide if an ambiguity exists. *Id.* at 1012. If the contract terms are clear and precise, the contract is not ambiguous, and the court is not permitted to consider any evidence concerning the parties' intent that is outside the contract itself. *Id.* at 1012. If the parties' intent cannot be discerned from the four corners of the agreement or if the language is susceptible of two or more reasonable interpretations, the meaning of the language is construed against its drafter, and a question of fact must be decided by a jury. *Geczi v. Lifetime Fitness*, 973 N.E.2d 801, 805–06 (Ohio Ct. App. 2012). Contract language can be interpreted by the court on summary judgment if the contract's terms are clear and unambiguous or, if the contract language is ambiguous, the

extrinsic evidence supports only one of the conflicting interpretations, notwithstanding the ambiguity. *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 406 (6th Cir. 2004).

One of the disputes in this case centers on the third element of the claim: whether the Bank fulfilled its obligations under the contractual agreement with Arlington.[3] The parties agreed in their contract that the Bank could collect service charges, with Arlington giving the Bank a security interest in its business checking account to permit the Bank to withdraw any debt Arlington owed to the Bank. Our inquiry is directed to what the parties' contract required of the Bank with respect to apprising its business customers of the applicability and amount of particular service fees.

The district court focused on whether the Bank breached its contractual obligation to notify Arlington concerning any *changes in fees* because the deposit adjustment fee did not appear on any comprehensive fee list which was made available to or given to. The court concluded that "the Rules and Regulations do not require that a charged fee appear on a 'then current Fifth Third Fee Schedule' or any other compiled list of fees, and the Bank is permitted to charge any fee as long as prior notice of the fee is provided in an appropriate manner to the customer. The court further reasoned:

> The language of ¶ 9 of the Rules and Regulations indicates that as long as information concerning the altered or amended rule, regulation, fee or charge was made available in defendant's offices for fifteen days prior to the fee or charge being imposed, or the customer was notified of the amendment or alteration by some other method provided by law, the change in the fee or charge is binding on defendant's account holders.

R. 92, Page ID 3689.

---

[3]At oral argument, Arlington conceded that it did not point the district court to any ambiguity in the contract language. As a result, Arlington raises ambiguity for the first time on appeal and that issue is not properly before us. *See United States ex rel. Wall v. Circle C Constr., L.L.C.*, 697 F.3d 345, 357 (6th Cir. 2012).

When the district court referred to paragraph 9 of the Rules & Regulations in effect in 2000, the court overlooked an important contractual phrase. Paragraph 9 actually stated that "[t]hese Rules and Regulations, *as well as fees and charges contained on the Fee Schedule*" could be altered or amended as specified in that paragraph. R. 83-1, Page ID 3307 (emphasis added). Paragraph 8 of the Rules & Regulations in effect in 2007 was even more specific, stating that "[t]hese Rules and Regulations, *as well as fees and charges contained on the Fee Schedule associated with your account(s)*" could be altered or amended as provided in that paragraph. Appellant's App'x, Vol. 1 at 130 (emphasis added). The language employed in both of these versions presupposed that the Bank had stated the fees and charges applicable to the account on the "Fee Schedule" before the Bank would take any action to alter or amend those fees and charges by following the procedure set forth in paragraph 9 (2000 version) or paragraph 8 (2007 version). We interpret this unambiguous language to mean that the Bank accepted a contractual obligation to disclose to its customers in writing on a "Fee Schedule" all of the fees and charges "associated with" the account or potentially applicable to the account.

The district court reached its contrary interpretation by disregarding the words, "contained on the Fee Schedule" or "contained on the Fee Schedule associated with your account(s)." The court's approach did not consider the contract as a whole or give effect to every part of it. *See Beasley*, 958 N.E.2d at 1011. Only by omitting the specified contractual phrases could the court reach its conclusion that the Bank could alter, amend, and presumably add fees and charges "so long as the information concerning fees was made available in defendant's offices for fifteen days prior to the imposition of the fees." R. 92, Page ID 3690. This interpretation of the contract was erroneous as a matter of law. *See Savedoff,* 524 F.3d at 763; *Beasley*, 958 N.E.2d at 1011.

The district court then credited the Bank's evidence without considering contrary evidence presented by Arlington. Bank managers testified that the Bank updated its branch offices weekly about new fees, changes in fees, effective dates of fee changes, and similar information; that the Bank "always" provides information to its branches at least fifteen days prior to the effective date of a fee change; and that the Bank tailors the notice it gives to personal and business customers based on the specific changes being implemented by using statement inserts, letters, product brochures, signs posted in branch banks, the customer call center, and the internet.

This general testimony lacked specific detail and evidentiary support. As the moving party, the Bank has the burden to identify those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, some of the Bank's evidence related to personal bank accounts, which are governed by the Truth in Savings Act. 12 U.S.C. §§ 4301–4313. That Act, however, does not apply to Arlington's business account. *See* 12 U.S.C. § 4313(1) ("The term 'account' means any account intended for use by and generally used by consumers primarily for personal, family, or household purposes.").

In contradiction to the Bank's evidence, Newman testified that Arlington did not receive any written fee information from the Bank, other than a copy of the Rules & Regulations, *before* fees were assessed to Arlington's account. After the fees were assessed in one non-itemized "service charge," Newman visited a branch bank seeking written information about the composition of the "service charge" and written documentation that the fees applied to Arlington's account, but very little information was provided to him. The only written documentation Newman received was an August 2007 computer printout showing the composition of the $41.00 service charge for July, after

13

the amount had already been deducted from Arlington's account. Newman took other steps to obtain information. He visited other branch banks seeking written confirmation that the fees charged actually applied to Arlington's account, but bank tellers were unable to provide such documentation. He looked at the Bank's internet website, but he did not find any fee information available there.

The district court summarily disregarded Arlington's evidence, reasoning that the Bank's inability to justify the fees *after* they had been assessed was immaterial to the ultimate issue of whether the Bank informed its customers of the fees *before* they were charged. But this analysis misses the precise point Arlington makes. If the Bank possessed written documentation to show business customers all of the potentially applicable fees before those fees were charged, surely the Bank would have produced it to Newman when he inquired or at the very least the Bank would have disclosed it during discovery and provided it to the court to support the Bank managers' declarations.

Similarly, if the Bank "made available in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law" information about anticipated alterations or amendments to fees, it stands to reason that the Bank would have produced that material. The Bank's obvious inability to produce any documentation that it provided to business customers or "made available in the offices of the Bank" before charging fees is circumstantial evidence that no such documentation existed. *See V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 469 (6th Cir. 2012) (observing that V & M Star Steel "produced sufficient circumstantial evidence to justify a jury trial"); *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 531 (6th Cir. 2012) (noting that circumstantial evidence is sufficient to survive summary judgment). Only after this lawsuit was filed did the Bank resort to its mainframe computer to produce hundreds of pages of fees potentially

14

applicable to Arlington's business account. Yet, it appears that this information was not accessible to the staff in the branch banks.

The Bank contends that it fulfilled its contractual obligations if it made information about fee alterations or amendments available to staff in the branch banks, and not to business customers. This argument disregards the intent of the parties as expressed in their unambiguous contract language. The Rules and Regulations provided that fee alterations and amendments "shall be binding on all Customers *after having been made available* in the offices of the Bank for fifteen (15) days or by such other method as specifically provided by law." The emphasized language evidences the parties' intent to create a notice provision. In other words, the Bank agreed to notify its business customers of contemplated changes to fees fifteen days before the effective date of those changes. Once proper notice of the changes was provided, the customers agreed to be bound by the changes. This language did not obligate Arlington to contact the Bank every fifteen days to inquire whether any new fees or fee modifications affecting its account were about to take effect. Rather, the contract placed the obligation on the Bank to give the business customer proper advance notice of any impending fee changes, after which the changes would be binding on the customer.

In summary, we conclude that the critical contract language must be considered in interpreting the agreement between the Bank and Arlington. In our interpretation of the contract, we consider all of the evidence presented and draw all reasonable factual inferences in favor of Arlington. *See Banks*, 330 F.3d at 892. When we do so, genuine issues of material fact emerge for trial concerning whether the Bank fulfilled its contractual obligation to disclose all fees and charges applicable to business accounts on the "Fee Schedule" associated with the account and whether the

Bank provided fifteen days' advance notice to business customers of any anticipated fee alterations or amendments.

### 3. The Bank's Defenses

The Bank contends that Arlington's breach of contract claim is barred by the voluntary payment doctrine and the contractual statute of limitations. We disagree on both counts.

Under Ohio law, money voluntarily paid by one person laboring under a mistake of fact to another person who claims the right to such payment is generally recoverable, but money voluntarily paid as a result of a mistake of law is not. *See State ex rel. Dickman v. Defenbacher*, 86 N.E.2d 5, 7 (Ohio 1949) (per curiam); *Consol. Mgmt., Inc. v. Handee Marts, Inc.*, 671 N.E.2d 1304, 1307 (Ohio Ct. App. 1996). "Simply stated, 'a person who voluntarily pays another with full knowledge of the facts will not be entitled to restitution.'" *Scott v. Fairbanks Capital Corp.*, 284 F. Supp. 2d 880, 894 (S.D. Ohio 2003) (quoting *Randazzo v. Harris Bank Palatine*, 262 F.3d 663, 667 (7th Cir. 2001).

Viewed most favorably to the non-moving party, the evidence shows that Arlington did not voluntarily pay the Bank the fees with full knowledge of the facts. The Bank did not disclose to Arlington all of the facts relating to the deposit adjustment fee or the increase in the returned item fee before automatically withdrawing those fees from Arlington's account and listing unexplained "service charges" on the monthly bank statements. Newman had to contact the Bank to question the composition and applicability of the "service charges." *Cf. Harris v. ChartOne*, 841 N.E.2d 1028, 1032 (Ill. App. Ct. 2005) (holding plaintiffs voluntarily paid charges listed on invoices where they made no effort to investigate the exact nature of the fees charged). In response to Newman's inquiries, the Bank could not produce any documentation confirming that these fees, in the amounts

16

charged, were applicable to Arlington's account. On this record, the voluntary payment doctrine does not bar Arlington's breach of contract claim as a matter of law. *See Nelson v. Am. Power and Light*, No. 2:08-cv-549, 2010 WL 3219498, *12–14 (S.D. Ohio Aug. 12, 2010).

The Bank points out that Arlington received actual notice of the "deposit adjustment fee" and the proper amount of the "returned item fee" before August 2007 because charges for those fees appeared on Arlington's monthly bank statements. But evidence that a general "service charge" was posted on the bank statements does not necessarily compel a finding that Arlington knew what the charge was for without further investigation. The ultimate issue is whether the Bank honored its contractual obligation as stated in the Rules & Regulations to disclose the fees and any changes to them *before* assessing the fees and whether Arlington had full knowledge of the facts before paying the fees.

Next, the Bank argues that Arlington's suit to recover fees incurred prior to July 2007 is barred by the contractual statute of limitations. Under Ohio law, parties can agree by contract to shorten the applicable statute of limitations if the time limit is reasonable and the contract language is clear and unambiguous. *Angel v. Reed*, 891 N.E.2d 1179, 1181 (Ohio 2008); *R.E. Holland Excavating Co. v. Montgomery Cnty. Bd. of Comm'rs*, 729 N.E.2d 1255, 1259 (Ohio Ct. App. 1999); *Universal Windows & Doors, Inc. v. Eagle Window & Door, Inc.*, 689 N.E.2d 56, 59 (Ohio Ct. App. 1996); *Arcade Co. Ltd. v. Arcade, LLC*, 105 F. App'x 808, 810 (6th Cir. 2004). The Ohio Supreme Court ruled that a clear and unambiguous two-year statute of limitations in an automobile insurance policy was reasonable and enforceable. *Angel*, 891 N.E.2d at 1181. In *R.E. Holland Excavating Company*, the parties agreed that certain claims and disputes between them would be subject to a resolution process governed by specific notice periods, potentially culminating in a sixty-day period

17

to file "a formal proceeding . . . in a forum of competent jurisdiction to exercise such rights or remedies as the appealing party may have with respect to such claim, dispute or other matter in accordance with applicable laws and Regulations." 729 N.E.2d at 1257. The Ohio Court of Appeals upheld that contractual clause as a reasonable reduction in the length of the statutory limitations period. *Id.* at 1259. The same court later held that a dealer agreement providing for a one-year period to file suit for breach of the agreement was a reasonable and enforceable contractual statute of limitations. *Universal Windows & Doors*, 689 N.E.2d at 58–59.

In this case, however, the language of the Rules & Regulations does not clearly and unambiguously shorten the Ohio breach-of-contract statute of limitations applicable to Arlington's lawsuit against the Bank. Paragraph 28 of the June 2007 version provided in pertinent part:

> Customer agrees to carefully examine and reconcile account statements. . . . Customer agrees that Bank will not be liable if Customer fails to exercise ordinary care in examining their (sic) statements. Customer will notify Bank of any discrepancy with any item, including, but not limited to, deposits, withdrawals, and checks, within thirty (30) days of the statement mailing or made available to customer date. . . . If notification is not received, Bank will have no liability for such item(s).

The plain language of this provision "neither mentions nor purports to limit any 'action,' 'lawsuit,' or 'demand.'" *Arcade Company Ltd.*, 105 F. App'x at 810. At most this paragraph attempts to release the Bank from liability if its customer fails to exercise ordinary care in examining and reconciling its bank statements and fails to notify the Bank of "any discrepancy with any item" within thirty days. "[U]nder Ohio's case law, something more than this language is required to support a finding that the parties intended to modify the statute of limitations." *Id.* No language like that used in the contracts at issue in *Angel*, *Universal Windows & Doors*, or *R.E. Holland Excavating Company* is found in the Bank's Rules & Regulations. *See id.* at 811. "In the absence of such

18

language, we will not infer an intent to create a contractual limitation period." *Id.* (noting that the finality achieved by a statute of limitations "must be made manifest in clear, unequivocal language.")

Accordingly, the Bank's defenses fail. Summary judgment in favor of the Bank was not warranted on Arlington's individual breach of contract claim.

## B. Class Certification

The district court denied Arlington's motion to certify a class action, and Arlington now appeals that decision. In light of our contract analysis, the district court should have an opportunity to reconsider the class-certification motion. While it appears to us that Arlington can meet all of the Rule 23(a) and (b)(3) prerequisites to class certification, we agree with the district court that the class definition as initially proposed by Arlington is too broad and must be narrowed. Accordingly, for the reasons stated below, we vacate the decision to deny the class-certification motion and remand to the district court for further proceedings consistent with this opinion.

### 1. Standard of Review

The district court has broad discretion to decide whether to certify a class, and we review its certification determination for an abuse of discretion. *Glazer v. Whirlpool Corp. (In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.)*, 678 F.3d 409, 416 (6th Cir. 2012). "An abuse of discretion occurs if the district court relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Id.*

### 2. Requirements for Class Certification

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550

(2011) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). The class representative must be a member of the class and must also possess the same interest and suffer the same injury as the class members. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012). "To be certified, a class must satisfy all four of the Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequate representation—and fall within one of the three types of class actions listed in Rule 23(b)." *Id.* (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998) (en banc)). Arlington sought class certification under Rule 23(b)(3), which demands proof that questions of law or fact common to the class predominate over individual questions and that the class action is a superior method to adjudicate the case fairly and efficiently. *See Glazer*, 678 F.3d at 416.

As the party requesting class certification, Arlington must affirmatively prove the Rule 23 certification requirements, and the court must subject that proof to "rigorous analysis." *Young*, 693 F.3d at 537 (citing *Dukes*, 131 S. Ct. at 2551). It is not enough for Arlington to recite the language of Rule 23. *Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*, 654 F.3d 618, 629 (6th Cir. 2011), *cert. denied*, 132 S. Ct. 1757 (2012). Rather, it "must be prepared to prove that there are *in fact* sufficiently numerous parties [and] common questions of law or fact," and the required "rigorous analysis" may "entail some overlap with the merits of [Arlington's] underlying claim." *Dukes*, 131 S. Ct. at 2551.

### 3. Class Definition

Before a court may certify a class under Rule 23, the definition of the class must be sufficiently precise to allow the court to determine administratively whether a particular individual is a member of the proposed class. *See Young*, 693 F.3d at 539. "[D]istrict courts have broad discretion to modify class definitions." *See Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501

F.3d 592, 619 (6th Cir. 2007). Likewise, we may "amend sua sponte the class certification to conform to the arguments that the parties have made in this court and below." *Barney v. Holzer Clinic, Ltd.*, 110 F.3d 1207, 1213–15 (6th Cir. 1997) (amending class definition to encompass named plaintiffs and those similarly situated).

Arlington moved to certify a class defined as:

> [A]ll individuals and entities who have or have had checking accounts with Fifth Third Bank ("Fifth Third") in the United States, who were charged and paid a fee for a service that was not listed on a then current Fifth Third Fee Schedule, or was in an amount that was different from that stated on a then current Fifth Third Fee Schedule, prior to the assessment of the charge, during the applicable limitations period. Excluded from the class are employees, officers, directors, legal representatives, heirs, successors and assignees of Defendant.

Arlington's App'x Vol. 1 at 12. But because the statute of limitations applicable to a breach of contract claim varies among the states in which the Bank conducts operations, Arlington sought certification of five subclasses, grouping bank customers by states with similar limitations periods: (1) Ohio and Kentucky; (2) Illinois, Indiana, and West Virginia; (3) Michigan, Tennessee, and Georgia; (4) Florida and Missouri; and (5) Pennsylvania.[4] *Id.* at 12 n.1.

The Bank contends that Arlington's proposed class definition is overly broad, and in certain respects we agree. Arlington is a business customer of the Bank. It has not alleged or produced evidence of any breach of contract claim relating to a personal bank account, such as those governed by the Truth in Savings Act. 12 U.S.C. §§ 4301–4313. Thus, Arlington cannot seek to hold the Bank liable for any fees it charged to personal bank accounts, and Arlington is not a proper named plaintiff to serve as class representative for customers with personal bank accounts. Furthermore,

---

[4]Arlington did not specify which group would include customers located in North Carolina. Arlington's App'x Vol. 1 at 12 n.1.

21

Arlington cannot represent the interests of business customers who maintain Treasury Management accounts, as bank fees applicable to those accounts are negotiated by the Bank and those customers. Therefore, the proposed class definition must be narrowed to exclude personal bank accounts and Treasury Management customers and must include only business account customers who do not negotiate their fees with the Bank (hereinafter "business customers"). *See Powers,* 501 F.3d at 618 (characterizing class as overbroad and modifying it to include only those persons who were represented by the Public Defender and excluding others who did not suffer the same harm as alleged by the class representative).

Another aspect of the proposed class definition is also problematic. Arlington includes as members of the class both those "who were charged and paid a fee for a service that was not listed on a then current Fifth Third Fee Schedule" and those who were charged and paid a fee that "was in an amount that was different from that stated on a then current Fifth Third Fee Schedule." These descriptions of potential class members do not reflect Arlington's litigation position nor are they supported by our legal interpretation of the contract or the evidence.

Under our construction of the Rules & Regulations, the Bank agreed to disclose to its business customer on a "Fee Schedule" all of the fees and charges "associated with" the customer's account before the Bank charged the fees to the customer. Thus, the class would include all business customers who were charged and paid fees for services that were not initially disclosed on a Fee Schedule that was made available to the customer before the fees were charged.

The Bank further agreed that it would not make alterations or amendments to the disclosed fees without first giving customers fifteen (15) days advance notice of the changes "in the offices of the Bank" or "by such other method as specifically provided by law." Thus, the class would also

22

include business customers who were charged and paid fees that were altered or amended in some way after initial disclosure on a Fee Schedule, if the Bank failed to give customers fifteen days' advance notice of the changes "in the offices of the Bank" or by some other method provided by law.

To summarize, the class Arlington seeks to represent may include only business checking account customers and should exclude customers who maintain personal checking or Treasury Management accounts. The class may include those business checking account customers who paid a service fee that the Bank did not initially disclose on a Fee Schedule before it charged the fee and those who paid a service fee that the Bank initially disclosed on a Fee Schedule, but then subsequently altered or amended without giving fifteen days' advance notice of the change in the offices of the Bank or by some other method provided by law. The district court on remand should consider appropriate class or subclass definitions in light of the concerns we have noted.

### 4. Rule 23(a) Prerequisites

#### a. Numerosity

"Federal Rule of Civil Procedure 23(a)(1) requires as a prerequisite to class action that 'the class [be] so numerous that joinder of all members is impracticable.'" *Young*, 693 F.3d at 541 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1079). "While no strict numerical test exists, 'substantial' numbers of affected consumers are sufficient to satisfy this requirement." *Glazer*, 678 F.3d at 418 (citing *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)). However, "impracticability of joinder must be positively shown, and cannot be speculative." *Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) (internal quotation marks omitted).

Under the specific facts presented, the numerosity requirement appears to be satisfied. *See id.* The Bank has more than 300,000 business checking account customers. Arlington will be able

23

to determine which of these customers are class members because the Bank is able to retrieve information from its computer databases identifying the customers who paid particular fees during specified periods of time. Because thousands of business customers are potentially class members, the numerosity requirement is likely satisfied.

### b. Commonality

To demonstrate commonality, Arlington must show that "there is a single factual or legal question common to the entire class." *Powers*, 501 F.3d at 619. The claims must depend on a common contention "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551. The court's inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit, not on whether common questions are raised. *See id.*

The district court found that this requirement was not satisfied, reasoning "[t]his is not a case in which the defendant engaged in a single act of failure to give notice or a single course of action which impacted all class members equally. Here, proof of each class member's claim still depends upon the facts and circumstances peculiar to that class member." R. 66, Page ID 3006. The district court rested its finding on the following concerns: that the Bank offers numerous types of accounts and fee structures; that it would be difficult or impossible to determine how each customer received notice of a particular fee; and that individualized inquiries would be necessary to determine whether the fees were actually paid by the customer or waived by the Bank.

These concerns do not compel a finding of no commonality. Although class members may have been impacted differently, the questions that will generate common answers applicable to all

24

class members are whether the Bank failed to disclose initially the fees applicable to its business accounts and whether the Bank failed to give notice to business customers in accordance with the Rules & Regulations before altering or amending the fees. The answers to these common questions will drive resolution of the lawsuit. *See Dukes*, 131 S. Ct. at 2551. Arlington produced sufficient evidence in its own case to suggest that the Bank did not initially disclose the fees applicable to Arlington's business account on a Fee Schedule and that the Bank made subsequent alterations or amendments to the fees without giving proper notice to its customers as provided in the Rules & Regulations. The record also includes evidence retrieved from the Bank's computer database identifying the business customers that actually paid particular fees during specified periods of time. Under the parameters of the revised class, there may be factual or legal questions presented that are common to the entire class and that are capable of class wide resolution.

Moreover, the size of a potential class and the need to review data concerning individual class members are not reasons to deny class certification. *See Young*, 693 F.3d at 539. Otherwise, large corporations effectively would be immune from many class actions simply due to the large number of customers who may have been harmed. *See Bateman v. Am. Multi-Cinema, Inc.*, 623 F.3d 708, 722 (9th Cir. 2010) (holding that if size of the defendant's potential liability alone were a sufficient reason to deny class certification, "the very purpose of Rule 23(b)(3)—'to allow integration of numerous small individual claims into a single powerful unit'—would be substantially undermined."); *Perez v. First Am. Title Ins. Co.*, No. CV-08-1184-PHX-DGC, 2009 WL 2486003, at *7 (D. Ariz. Aug. 12, 2009) ("Even if it takes a substantial amount of time to review files and determine who is eligible for the [denied] discount, that work can be done during discovery."); *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 250 (W.D. Pa. 2008) (finding class action

manageable despite First American's assertion that "no database exists easily and efficiently to make the determinations that would be required for each file").

Under our established precedent, Arlington appears to satisfy the commonality requirement. *See Powers*, 501 F.3d at 619. Accordingly, the district court abused its discretion in finding otherwise.

### c. Typicality

The typicality test "limit[s] the class claims to those fairly encompassed by the named plaintiffs' claims." *Sprague*, 133 F.3d at 399 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082). "The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.* The representative's interests must be aligned with those of the representative group such that the representative's pursuit of its own claims advances the interests of the class. *Id.* "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory." *Powers*, 501 F.3d at 618 (quoting *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082). The commonality and typicality requirements "tend to merge" into one inquiry. *Gen. Tele. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982); *Young*, 693 F.3d at 542; *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).

The requirement of typicality is also likely met. The proper focus is not on whether business customers actually *received* initial disclosure of fees applicable to their accounts or actual notice of fee changes. The focus is on whether the Bank *provided* the contractually required disclosure and notice.

The Bank attempts to distinguish Arlington from other class members, but nothing in the record suggests that Arlington is unique when compared to the Bank's other business customers who maintained business checking accounts like Arlington's. The Bank also contends that Arlington's allegations are directly contradicted by the Bank's unrebutted declaration testimony and are not supported by any evidence. We disagree based on our previous discussion reversing the grant of summary judgment in favor of the Bank on Arlington's individual claim. Arlington produced sufficient evidence to generate genuine issues of material fact for trial on the common, typical questions at issue.

By advancing central theories—that the Bank breached its contractual obligation to disclose fees initially and then failed to provide proper notice of fee changes in accordance with the Rules & Regulations—Arlington advances the interests of the class because the same alleged conduct by the Bank triggers each class member's claim. *See Powers*, 501 F.3d at 618; *see also Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (finding typicality where named plaintiffs' claim "is the same allegation any other class member would bring"). In *Beattie*, we recognized that questions such as whether a customer was actually affected by an allegedly deceptive billing practice or would have abandoned the service in question in the absence of the deception are not dispositive of typicality but instead affect the issue of damages, which can be resolved through resort to subclasses, if necessary. 511 F.3d at 562. The same is true here.

### d. Adequacy of Representation

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent. A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Young*, 693 F.3d at

27

543 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)). To evaluate this requirement, courts "review[] the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests that are not antagonistic to one another." *Beattie*, 511 F.3d at 562-63 (quoting *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000)).

There appears to be no dispute that class counsel are competent to conduct this litigation. In light of all we have said, Arlington is a proper class representative. The district court found that Arlington is not a proper class representative for several reasons, including: it received actual notice and waiver of the deposit adjustment fee several times before it was required to pay the fee; it does not have standing to pursue the claims of other class members that arose prior to 2000, the date Arlington opened a business checking account; it does not have standing to challenge the validity of certain types of fees it did not pay; and it has diverse interests from personal account holders, who are entitled to receive a different form of notice and are not subject to the deposit adjustment fee.

These reasons do not warrant a finding that Arlington is an inadequate class representative. As we have already explained, the class is narrowed to eliminate personal checking account holders, and the focus is on the Bank's initial disclosure of fees and subsequent notice of fee alterations to its business customers, as we have defined them above. It is not relevant whether class members received actual notice. With respect to standing, once a plaintiff establishes individual standing, whether that plaintiff is able to represent the putative class depends solely on whether the plaintiff meets the criteria of Rule 23. *See Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 422 (6th Cir. 2012). Finally, Arlington proposes subdividing the class according to the applicable statutes of limitations to account for the Bank's concern about any stale claims.

There is no basis for a finding that Arlington and the class members have interests that are antagonistic to one another. *See Beattie*, 511 F.3d at 563. Ultimately, Arlington advances the same interest and injury as every other class member. The adequacy requirement therefore does not fail for the reasons given by the district court.

### 5. Rule 23(b)(3) Prerequisites

Arlington sought class certification under Rule 23(b)(3), "which requires a demonstration that questions of law or fact common to the class predominate over individual questions and that the class action is superior to other available methods to adjudicate the controversy fairly and efficiently." *Glazer*, 678 F.3d at 416. The matters pertinent to these findings include: (A) the interest of class members in controlling the prosecution of separate actions individually; (B) the extent and nature of any litigation concerning the controversy that the class members have already commenced; (C) the desirability or undesirability of concentrating the litigation in the forum; and (D) the difficulties likely to be encountered in managing the class action. Fed. R. Civ. P. 23(b)(3).

#### a. Predominance

The predominance requirement of Rule 23(b)(3) tests whether a proposed class is sufficiently cohesive to warrant adjudication by representation. *Beattie*, 511 F.3d at 564. "To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young*, 693 F.3d at 544 (quoting *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352–53 (6th Cir. 2011)). "[T]he fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones. . . . [C]ommon issues may predominate when liability can be determined on a

29

class-wide basis, even when there are some individualized damage issues." *Beattie*, 511 F.3d at 564 (citations and internal quotation marks omitted). This requirement "parallels" the commonality inquiry in Rule 23(a)(2) but is "more stringent." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1084; *see also Powers*, 501 F.3d at 619 (noting that the assertion of "a single factual theory of wrongdoing and seek[ing] to recover based on the single legal claim" is sufficient to satisfy predominance where "[t]he dispositive facts and law are the same as to each class member").

Whether the Bank initially disclosed to business customers the fees applicable to their accounts and whether the Bank later made alterations to the fees after giving proper advance notice as required by the Rules & Regulations are issues common to the class that predominate over any individual issues that may arise. *See Beattie*, 511 F.3d at 564; *Powers*, 501 F.3d at 619. Answering these liability questions with regard to the entire class is preferable to separate litigation of individual claims. Therefore, the predominance requirement appears to be met. Although some individualized inquiries may arise with regard to damages, the court may decide to utilize subclasses as an appropriate means of handling those issues. *See In re Whirlpool Corp.*, 678 F.3d at 421.

### b. Superiority

Finally, the class action appears to be a superior method to litigate the claims because of the relatively small amount of damages each business customer is likely to have suffered from the breach of contract alleged. *See Beattie*, 511 F.3d at 567 (citing *Amchem Prod., Inc.*, 521 U.S. at 617) (holding that the "small possible recovery" of $124 per class member warranted a finding in favor of superiority). We affirmed a superiority determination on the ground that "members are not likely to file individual actions because the cost of litigation would dwarf any potential recovery." *Glazer*, 678 F.3d at 421. The same analysis applies here.

30

### III. CONCLUSION

For all of the reasons discussed above, the district court erred in granting summary judgment in favor of the Bank on Arlington's individual claim. The court also erred, even under our deferential abuse-of-discretion standard, in declining to certify a class. The class as proposed must be narrowed and redefined along the lines stated in this opinion. We leave to the district court implementation of these and any further refinements to the class definition it deems necessary for management of the litigation.

Accordingly, we **REVERSE** the grant of summary judgment to the Bank, we **REVERSE** the denial of class certification, and we **REMAND** to the district court for proceedings consistent with this opinion.